## No. 15,526.

### SILLIMAN *v.* THE PEOPLE.
(162 P. [2d] 793)

Decided September 10, 1945.   Rehearing denied October 8, 1945.

132

Mr. EARL J. HOWER, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

CHARLES FORD SILLIMAN, to whom we herein refer as defendant, was found guilty of murder in the first degree and judgment entered in accordance with the verdict fixing the death penalty. To review this judgment he has sued out a writ of error and assigns forty-three errors, to which reference will hereinafter be made.

The offense of which defendant was found guilty was the murder of his wife, Esther Corrine Silliman, by administering strychnine. The crime was committed January 22, 1944, and upon arraignment February 11, 1944, defendant entered his plea of "Not guilty" "Not guilty by reason of insanity at the time of the alleged commission of the crime" and "Not guilty by reason of insanity since the alleged commission of the crime." Upon the entry of these pleas, defendant, by order of the district court, was confined in the Colorado Psychopathic Hospital at Denver, Colorado, for observation.

The trial was begun on March 8, 1944, and at its conclusion the jury, on March 16, 1944, returned its verdict finding the defendant guilty of murder in the first degree and fixing the penalty at death. A motion for a new trial, specifying forty-six alleged errors, was filed, and on April 6, 1944, overruled and judgment upon the verdict pronounced.

The facts as disclosed by the record, briefly stated,

are these: Defendant lived most of his life in eastern Colorado where he was married to his deceased wife in October, 1933. Two children were born of this marriage, the elder being a son about eight years of age and the younger a daughter about four years of age. While living in eastern Colorado, defendant was engaged in farming and, for a period of time, as a truck driver. In August, 1943, he came to Denver to find employment. About September, 1943, his wife and daughter joined him and, until the tragedy, resided with him at 677 South Federal Boulevard, in Arapahoe county, Colorado. On coming to Denver defendant first was employed by a local lumber company and after some months, when this employment was terminated, as defendant says, by reason of lack of business—his employers assigning another reason therefor—he obtained employment with some transportation company.

During the fall of 1943 defendant became acquainted with a woman whom he met in a beer tavern in Denver and later that fall and early winter he met her on several occasions, and during December, while his wife was absent, he rather frequently visited this woman acquaintance, and on one or two occasions entertained her and her roommate and a man at his home. In December—the exact date of which seems to be in dispute —defendant's wife and daughter returned to eastern Colorado to visit her parents and her son, who had remained there.

At the time of the wife's departure, defendant claimed that he was in ill health. According to his testimony— and he alone testified with reference thereto—he had some eye affliction which seemed to be increasing, and he had financial difficulties, which, when he detailed them, seemed to be of no unusual moment.

The wife and daughter returned to Denver from Cheyenne Wells shortly after Christmas, 1943.

According to defendant's testimony, he and his wife, in the early fall of 1943, had discussed his condition of

health and their financial situation and, as a result, they entered into a suicide pact, which included the murder of their two children. According to his testimony, this pact had been frequently discussed between him and his wife. Defendant states that on January 22, while at work, the suicide pact and his difficulties with reference to health and financial matters so prayed on his mind and became so oppressive that he then decided to procure some strychnine and carry the pact into effect. Pursuant to this determination, he went to a drugstore, purchased some strychnine, and registered under a fictitious name and address. After procuring the strychnine he went to a liquor store, bought a bottle of brandy, and then drove to the apartment of his woman acquaintance. After attending to some errand with this woman, he returned to her apartment, poured part of the brandy into an empty bottle, and gave the remainder thereof to the woman. Upon leaving the woman's apartment, he purchased some groceries, and, before reaching his home, put some of the strychnine into the brandy which he had retained. Upon his arrival at his home, and while preparing for their evening meal, defendant states that something "hit him" and "told him to go ahead with it and not prolong it any longer," this, as he testified, referred to the suicide pact. He then went to his auto, procured the poisoned brandy, poured some of it into a small glass, and gave it to his wife. The wife, before drinking any of the poisoned brandy, gave a sip thereof to their daughter and then immediately drank some of it. The wife and daughter died within a few moments thereafter. Defendant testified that he took some of the poisoned brandy but spit it out at once.

Immediately prior to the death of his wife and daughter, defendant sought assistance for them from neighbors, who called a doctor, but he and they were unable to render effectual medical or other aid. When the officers were called and arrived, defendant disclaimed any knowledge as to the cause of the death of his wife and

daughter, excepting he suggested that perhaps it was occasioned by some food that they had eaten. During the investigation at defendant's home, the officers found a bottle which had contained strychnine, and this and other evidence of criminality caused the sheriff to place defendant under arrest and take him to the county jail.

During the morning of January 23, defendant was interrogated by the officers and made a complete and detailed confession which later was repeated to the deputy district attorney and the officers, their questions and answers being taken in shorthand and subsequently transcribed. These questions and answers constituted People's Exhibit L, hereinafter referred to as the written confession. It consisted of fourteen pages, subscribed by the defendant, initialed by him on each page thereof, and witnessed by the deputy district attorney, the sheriff and two of his deputies. If the answers therein contained are true, there can be no doubt as to the cause of death and no possible question as to defendant's culpability if he was sane.

Defendant was found to be an indigent person; counsel was appointed for his defense; we waived the requirement of an abstract of record and granted permission to submit the case on typewritten briefs. The record consists of sixteen hundred sixty-four folios, all of which has been read and given the careful consideration that the seriousness of this case merits.

The forty-three assignments of error may be thus summarized: (1) Refusal of the court to grant defendant's counsel the privilege of examination and inspection of defendant's written confession before cross-examining witnesses thereto; (2) denial of defendant's motion to strike the testimony of Drs. Murphey and Davis, expert witnesses called by the people; (3) district attorney's questions on cross-examination of defendant's father; (4) refusal to grant a mistrial on account of unsanitary conditions in the jury room; (5) the giving of instructions; and (6) refusal of the court to give ten-

dered instructions. We shall discuss these summarized assignments in the order mentioned.

■ 1. The court, out of the presence of the jury, heard testimony to determine whether the written confession, Exhibit L, was voluntary. The district attorney during this examination asked no question pertaining to the contents of Exhibit L, and on direct examination no witness volunteered any information as to its contents. The questions asked by the district attorney related solely to the circumstances and conditions under which the confession was obtained. Before cross-examining any of the witnesses, defendant's counsel requested the opportunity of examining the exhibit. This request was denied by the district attorney, and a motion based thereon was denied by the court. It should be borne in mind that the sole question for the court's determination at the preliminary hearing was the voluntariness of the confession. At such a hearing the contents of the confession are wholly immaterial, and had questions pertaining thereto been asked, either on direct or cross-examination, they probably would have been objectionable. *Fincher v. People*, 26 Colo. 169, 56 Pac. 902; *Mitchell v. People*, 76 Colo. 346, 232 Pac. 685; *Moya v. People*, 88 Colo. 139, 293 Pac. 335; *Bruner v. People*, 113 Colo. 194, 156 P. (2d) 111; *Ah Took Chang v. United States*, 91 F. (2d) 805; 2 Wharton's Criminal Evidence (10th ed.) pp. 1420, et seq.; 22 C.J.S. 1458; 20 Am. Jur. 452.

■ Exhibit L was a part of the people's evidence, and the only question with which the court was then concerned was whether it was voluntarily given so as to become admissible when offered in evidence. When the exhibit was offered finally, defendant's counsel was given the opportunity of examining it for the purpose of interposing any objection that he might have thereto.

We might state at this point that there was no evidence at the preliminary hearing or subsequent thereto indicating that the confession was involuntary as being

obtained by the use of either force, coercion, threats, promises or hopes. If defendant was sane at the time the confessions were made, his guilt was established thereby beyond question of doubt.

The sheriff and two of his deputies were called as witnesses for the people, and upon direct examination were interrogated with reference to the circumstances under which the defendant made an oral confession prior to the written one designated as Exhibit L. These witnesses were permitted to testify in detail as to the oral confession and again defendant's counsel moved for permission to examine Exhibit L before cross-examining these officers with reference to the oral confession. This motion was denied. During the examination of the officers no question was asked as to the contents of Exhibit L, and it was not offered or received in evidence until just before the people rested their case. The oral confession of defendant was the only evidence then before the court and jury. There was no requirement that the people ever offer the written confession. It was an extrajudicial confession and could be retained by the prosecuting officers until such time as they desired to make use thereof. No right of defendant was violated when his motion for examination and inspection was denied. When the people saw fit to offer the written confession, then, and not until then, was defendant entitled to examine and inspect it. This right was accorded him for the purpose of interposing any objection he might have thereto. While we have been unable to find any decision in this jurisdiction directly in point, we are not without ample authority to support this position. *Abdell v. Commonwealth,* 173 Va. 458, 2 S.E. (2d) 293; *State v. Yeoman,* 112 O. St. 214, 147 N.E. 3; *State v. Kupis,* 37 Del. 27, 179 Atl. 640; *Cochrane v. State,* 48 Ariz. 124, 59 P. (2d) 658; *St. Clair v. State,* 104 Tex. Cr. 423, 284 S.W. 571; *State v. Fitzgerald,* 130 Mo. 407, 32 S.W. 1113; *People v. Fisher,* 340 Ill. 216, 172 N.E. 743; *People ex rel. v. Supreme Court,* 245 N.Y. 24, 156 N.E.

84; 17 Am. Jur. 19; 64 C.J. 117; 23 C.J.S. 263, 425; 2 Wharton's Criminal Evidence (11th ed.) 1354; 6 Wigmore on Evidence (3d ed.) 392.

Counsel for defendant places great reliance on Mr. Wigmore's statement (6 Wigmore on Evidence [3d ed.] 477, §1861) and particularly the following which, at first glance, would seem to lend support to this contention: "(b) In the second place, when a writing is *offered to a witness* for the preliminary purpose of testifying to its *execution* or *identity,* with the object of not actually offering it in evidence until a later stage in the case, fairness requires that *the opponent should see it* then or before the witness leaves the stand, in order that the opponent may cross-examine as to the writing; for otherwise the writing might not be actually offered until after the witness had left the court-room and become unavailable for the purpose of cross-examination. This application of the rule is in the United States generally accepted."

Mr. Wigmore cites, as his authority, opinions in criminal cases from several jurisdictions. An examination of these decisions, however, discloses that in most of them the right of examination and inspection is purely statutory, and in the same volume, p. 392, the author clearly indicates that in the absence of statute the right of examination and inspection is nonexistent. Mr. Wigmore (6 Wigmore on Evidence [3d ed.] 395) rather severely critizes the late Justice Cardozo for failing, in *People ex rel. Lemon v. Supreme Court,* 245 N.Y. 24, 156 N.E. 84, to determine that this right of examination was inherent in the courts. No statute giving the right of examination and inspection prior to the time an exhibit is actually offered in evidence is to be found in our jurisdiction.

It might here be observed that conceding the right of defendant's counsel to examine and inspect the written confession, and that the denial thereof was improper, nevertheless no prejudice resulted. Defendant

took the witness stand and on direct examination testified to every important and substantial statement contained in the written confession necessary to establish his culpability if he was sane. *Honda v. People,* 111 Colo. 279, 141 P. (2d) 178.

■ There appear in Exhibit L some minor corrections and alterations. As hereinbefore stated, the exhibit bore defendant's signature and on each page thereof his initials. The uncontradicted testimony is that these corrections and alterations were all suggested by defendant and made before the confession was signed. Under these circumstances, the corrections and alterations were fully and satisfactorily explained, and, further, it might be added, no correction or alteration made in the confession at defendant's suggestion or, if made otherwise, in anywise casts any light on the guilt or innocence of defendant. The corrections and alterations all pertain to wholly inconsequential, if not immaterial, matters.

■ ■ 2. Defendant interposed the defense of not guilty by reason of insanity, to support which he called Dr. J. P. Hilton as a witness, who testified that in his opinion defendant was insane. The people called three expert witnesses who testified that in their opinion defendant was sane. Each expert testified that he made an examination of defendant outside the courtroom and had reached his opinion as to defendant's mental condition prior to the trial. The defendant moved to strike the testimony of Drs. Murphey and Davis, witnesses for the people, basing his motion upon the fact that both doctors had examined records other than those of their own making and were not present in the courtroom during the taking of all the testimony. With reference to the examination of records, the doctors testified as follows:

Dr. Murphey testified that he had examined defendant on two occasions and had been present in the courtroom during most of the trial. His testimony with ref-

.erence to his presence during the trial and records which he had examined is as follows: "Q. When did you make that examination [of defendant], first? A. First, on the evening of March 1st. Q. And after that? A. And again on the morning of March 2nd. Q. Where was the defendant when you made that examination? A. At the Colorado Psychopathic Hospital. Q. Have you been in this courtroom and observed the defendant during the trial of this case? A. During most of the trial, yes, sir. Q. What part weren't you present? A. I was not here early, during the selection of the jury, and I was out of the courtroom for brief times on other occasions. And there were one or two half days during the course of the trial when I was not here. I think there was one whole day, but I could not tell what day. Q. That was before the selection of the jury? A. Yes. Q. You have been here all the time since the selection of the jury? A. No, I think there have been some of the time I was not here. Q. Were you in the courtroom here? A. Most of the time. * * * Q. Will you tell the jury what you found from your examination of this defendant, what your examination consisted of, and what you found, and the result of your examination, please?"

Dr. Murphey then stated at great length and in detail his examination and observation and, among other things, stated, "I did a physical examination of the body—found nothing that was relevant. I looked at the laboratory tests as recorded at the hospital, and found nothing there that was particularly relevant. Out of this kind of an examination and attempted valuation, I concluded that the boy was not insane."

"Q. In your opinion, did you base any of your opinion upon what you found in the laboratory notes or notes you took of the physical examination? A. No, I tried to establish my opinion in terms of what I could see, smell and hear, and take in with my own senses. Of course, where I could not do that, in terms of the con-

dition of his blood, for example, I had to depend on laboratory tests."

Dr. Murphey testified on cross-examination: "Q. Dr. Murphey, I believe you stated that, from your examination of this defendant, including the nurses' reports and laboratory reports, from that you determined that the man was sane, is that right? A. No, I did not. Q. You did not say anything about the nurses' reports? A. I did. Q. That was part of your examination, was it not? A. No, when I got through examining the boy I went downstairs and looked at the records and also after I had completed my examination I went to the nurses' chart and looked at their daily recordings. Q. Why? A. Simply because I did not want to be in the position of overlooking anything, and it seemed important to me to know what went on during the hours that I was not there, as well as the hours when I was there."

Dr. Robert W. Davis, who was an expert on diseases of the nervous system and resident psychiatrist at Colorado General Hospital, testified as to the basis of his opinion. "Q. While the defendant was there did you personally examine him? A. Yes. Q. What was the purpose of your examination? A. To decide whether he was sane or insane, in a legal sense. Q. Did you arrive at an opinion concerning his sanity? A. Yes. Q. What is your opinion? A. My opinion is that he is sane."

On cross-examination, Dr. Davis testified that he had observed and interviewed the defendant on several occasions, and further testified that it was his duty as resident psychiatrist to be familiar with the records of the patients in the psychopathic ward. These records with which he had a familiarity were made by different people, and, upon the assumption that these records had been taken into consideration in forming the doctor's opinion, the following occurred on his cross-examination: "Q. I believe you stated that when you examined the nurses' reports and the reports of the staff—that is

in the record, isn't it? A. Yes. Q. And laboratory reports? A. Yes. Q. And some of those reports were made by Dr. Rymer, examinations and so forth, in those reports? A. I believe so. Q. And that in addition to your observing him in the ward and talking to him, from those things you came to your conclusion that he was sane? A. I would say I came to my conclusion he was sane from my own examination, from my interviews with him and observation of his conduct. Q. Why did you go to all the trouble, then, to examine all these records and reports of this man? A. It is my duty to be familiar with them, as resident psychiatrist."

It is true that some laboratory records were made while defendant was under observation and that the expert witness for defendant, as well as some of the expert witnesses for the people, examined them. However, the record also discloses that each of those expert witnesses testified positively that his opinion was formed as a result of his own examination and observation of defendant. In this particular, the case is distinguishable from *Ingles v. People, infra,* upon which counsel for defendant relies.

The uncontradicted testimony discloses that none of the experts, either for the people or for defendant, were in the courtroom during the entire trial. However, if it be contended that the absence of these witnesses from the courtroom for short intervals of time during the trial resulted in their disqualification as witnesses, then each of the experts is disqualified and would be equally incompetent, notwithstanding their positive testimony that their opinions were the result of personal examinations and observations of the defendant. There is no law to support such a contention and no decision has been brought to our attention announcing such a rule. We venture the opinion that none can be found.

Defendant has called our attention to the opinion in *Ingles v. People,* 90 Colo. 51, 6 P. (2d) 455, and takes the position that the experts for the people in the in-

stant case were disqualified by our decision there. We have carefully reconsidered that decision in the Ingles case, supra, and are in entire agreement therewith. We believe that the most casual reading will convince one that the law as therein announced with reference to the basis upon which an expert's opinion is formed is inapplicable to the instant case.

No error was committed in denying defendant's motion to strike the testimony of Drs. Murphey and Davis. They were competent witnesses and qualified to testify, and their evidence was properly submitted to the jury for its consideration.

3. Defendant called his father as a witness. During the course of his direct examination he was asked: "Q. What kind of a boy has he been? A. He has been a good boy. Q. Has he ever been in trouble? A. None to speak of. * * * Q. Did you have any difficulty with him, in raising the boy? A. No, sir. Q. Did you know of any difficulty or did you ever hear from him or his wife that they were having any difficulties at all? A. Never did."

On cross-examination the district attorney, after asking the witness if he had been to see his son about a week after the tragedy, asked this question of the father: "Q. Mr. Silliman, did you tell the Sheriff that the boy had gotten in this trouble and that you were not going to pay any money, he could get himself out the best way he could, and the County could hire the attorney for him?"

To this question an objection was made and sustained, and thereupon the court instructed the jury as follows:

"Gentlemen, you are instructed that you are to entirely disregard the statements made by counsel after and during the last question directed to the witness W. J. Silliman. Do you understand? That is not evidence and I do not want you to consider that."

144

In view of the sustaining of the objection to this question by the court and his specific instruction to the jury to disregard it, no prejudicial error is shown.

4. While in the process of selecting a jury for the trial, and out of the presence of prospective jurors, a delegation consisting of three jurors from those then in the jury box, complained to the judge concerning conditions and inconveniences in their jury room. The delegation represented that the jurymen had used the room for two nights; the beds were unsatisfactory; the bedding dirty; and that there was a lack of hot water and proper toilet facilities. In response to a motion of defendant to declare a mistrial on account of the conditions in the jury room, the court stated: "At this time the motion [for mistrial] will be overruled. This is the same jury room, the same beds, the same water facilities that the jurors who have tried cases in this County, including murder cases, for many years past have used, and the Court does not feel that any prejudice would be directed towards the defendant." If conditions in the jury room were not as desirable and convenient as could be desired, it is difficult for us to see wherein this fact could prejudice the rights of a defendant who was on trial for a criminal offense.

5. In his assignment of errors defendant complains, inter alia, concerning nine instructions given by the court, and while no objection was made to the giving of some of them at the time of the trial, we will disregard this fact and consider the instructions given as though proper objection thereto had been seasonably made.

The court advised the jury in one of its instructions that if the defendant " * * * committed the homicide charged in the information · * * * by means of poison * * * malice, deliberation, premeditation, and intent * * * need not be proved." Defendant apparently takes the position that irrespective of the method of effecting a homicide, malice, deliberation, premeditation and in-

tent must be proved. The most casual reading of our decisions will convince one that this contention is without legal support. *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031; *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; *Frady v. People,* 96 Colo. 43, 40 P. (2d) 606.

Another instruction informed the jury as to the weight to be given defendant's confession and the circumstances surrounding the obtaining of the same. No instructions were tendered on this subject. The instruction given is not a model; it is not as complete or as clear as it might be, but in view of the evidence and bearing in mind the fact that there is no intimation and no evidence that the confession was other than voluntary, the defendant is in no position to complain, and we do not find that his rights were even remotely prejudiced by this instruction.

Complaint is made of a commonly-termed stock instruction by the court advising the jury that its verdict must be based entirely on evidence relative to the crime charged and that testimony concerning "another transaction" "is admissible only as bearing upon the question of whether or not the defendant had a plan or design to produce a result of which the act charged in the information is a part, * * *" this instruction concludes with the following, "the defendant cannot be tried for or convicted of any offense not charged in the information."

When we consider the fact that the death of the wife, with the murder of whom the defendant was charged, and that of his daughter, occurred almost simultaneously in a room in defendant's home, it is apparent that the death of the daughter would be referred to inadvertently by one or more witnesses. The instruction given was precautionary and proper, and one which tended, so far as human agencies could, to prevent the defendant from being prejudiced by his inhuman treatment of his own child. It was not necessary to emphasize defendant's inhumanity by specifically pointing out in this in-

struction any other crime of which defendant, by his repeated confessions, was guilty.

An instruction, to which an objection was made, limited the jury to three verdicts, i. e., (1) murder of the first degree; (2) not guilty, and (3) not guilty by reason of insanity. Defendant took the position at the trial that under the evidence he could be found guilty of murder of the first degree, or murder of the second degree, or involuntary manslaughter. Our statute (§32, c. 48, '35 C.S.A.), specifically provides that murder perpetrated by means of poison shall be deemed to be murder of the first degree. The evidence conclusively established that if the defendant was guilty of a crime in connection with the death of his wife, it was perpetrated by means of poison, and, consequently, if the jury was convinced of defendant's guilt and sanity, no other verdict was proper. If the jury determined from the evidence that defendant committed the crime charged and was legally responsible for his act, it had no choice in the matter; it was obligated to find him guilty of murder of the first degree. The only discretion then vested in the jury was to determine whether the punishment to be inflicted should be death or life imprisonment.

The tendered instructions to be discussed in this paragraph can be classified generally as instructions defining malice; submitting first and second degrees of murder, and voluntary manslaughter; and required proof of premeditation, deliberation, malice and intent. From what has been said herein respecting the necessary elements to be established by proof in a case where murder by poison is charged, it is unnecessary for us to further comment upon the assignments which have to do with these questions. The requested instructions do not contain a correct statement of the applicable law, and no error was committed in refusing to give them.

An examination of the record convinces us that the defendant was given a fair and impartial trial and that no prejudicial error was committed. The evidence was

such that the jury, under its oath, must have been con-
vinced, beyond a reasonable doubt, that the defendant
committed the crime with which he was charged and
that he was sane at the time of the commission thereof,
prior and subsequent thereto. He made a detailed oral
confession to the officers. Subsequently he made a de-
tailed written confession which was remarkable in that
the statements therein accurately coincided with the
substantial facts and circumstances related in his oral
confession. Defendant's expert witness, Dr. Hilton, as
well as one of the people's expert witnesses, Dr. Rymer,
each testified, without objection, to the details of the
crime as the same were related to them by the defend-
ant while under observation at the Colorado Psycho-
pathic Hospital almost a month after the crime was
committed. The statements attributed to defendant by
these witnesses were substantially the same as were
given to the officers by the defendant almost immedi-
ately after the tragedy. The defendant, as a witness in
his own behalf, remembered every detail of the crime
essential to his conviction, and only the facts and cir-
cumstances occurring immediately after the completion
of the crime were hazy in his mind. We are convinced
from the record, as the jury must have been from the
evidence, that defendant's defense of insanity was an
afterthought and conceived by him as a means of escap-
ing the penalty which, under the evidence, he merited.
As we have said, he was indigent, and counsel was ap-
pointed to represent him. An examination of the record
clearly discloses that his counsel was true to the highest
traditions of our profession and protected the rights of
defendant in every way known to a skillful trial attor-
ney and that he preserved a most excellent record for
our consideration.

The defendant was given every protection that the
statute affords one charged with the commission of a
crime. One of the ten commandments is, "Thou shalt
not kill." This is incorporated into our statute (§32, c.

48, '35 C.S.A.). Defendant violated the law of both God and man, and his punishment is inescapable.

The judgment is affirmed and it is ordered that it be executed during the week commencing November 5, 1945.