## No. 19,251.

LA VERN JACKIE JONES *v.* PEOPLE OF THE STATE OF COLORADO.

(360 P. [2d] 686).

Decided March 20, 1961.   Rehearing denied April 10, 1961.

Mr. REXFORD L. MITCHELL, Mr. ARMAND L. FORBES, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

JONES was charged with the crime of murder, tried and found guilty by a jury which fixed the penalty at death. Sentence was imposed upon this verdict, and Jones seeks reversal by writ of error.

To informatively determine his assignments of error requires a recitation of the events actuating the formal charge laid against him, and certain proceedings which took place in the course of the trial.

On February 10, 1959, at about 9 o'clock in the evening Jones went to the garage in La Junta where he was employed. He and a number of other persons were invited to attend a showing of some new machinery. Refreshments were served during the evening, and Jones partook thereof. The evidence is in dispute concerning the amount of liquor consumed by Jones, but there is agreement that he was not intoxicated.

Jones left the garage about 2 o'clock in the morning of February 11th and drove home, where he remained for a short time. He then drove his car to the El Otero

Hotel, formerly the Kit Carson Hotel, in La Junta. It appears from the evidence that he went to the hotel for the purpose of getting money. To effectuate his purpose he removed a ball pean hammer from the trunk of his car.

When he arrived at the hotel he found two persons there: Richard Houchens, a sixteen-year-old bellboy, and David Milton Powell, the desk clerk, both of whom worked nights. Jones had known Powell for some time prior to the morning in question and the two engaged in conversation.

The bellboy was permitted to sleep on a lounge in the hotel lobby when not required to perform services, and during the conversation between Jones and Powell he fell asleep.

After the bellboy started his slumber, Jones pulled the hammer out of his coat pocket and hit Powell on the head with it, causing him to fall off the stool and land on the floor. The handle of the hammer broke, and as Powell attempted to get up, Jones picked up a pipe wrench about eighteen inches in length lying near the desk at which Powell worked and struck Powell several times about the head with it.

The bellboy awakened, but what caused him to awaken is not clear from the evidence. He believed he was roused by the noise made by Jones in removing money from the cash register and cash drawer. At any rate, the first sounds he remembered hearing after awakening were the sounds of change rattling as the money was being removed, and the heavy breathing of Powell.

Fully awakened, the bellboy sensed a condition gone awry and one which he believed was fraught with danger to himself. Thus infected with fear, he remained on the lounge feigning sleep whenever Jones looked toward him. After Jones had gathered some $398.00 at the reception desk, he left the hotel lobby.

The bellboy then arose and, looking behind the desk, saw Powell lying there bleeding. He immediately sum-

moned the owner of the hotel who lived on the second floor. The owner came downstairs and found the office in a state of disarray, with the chair on which Powell had been seated on its side and blood-stained. Approaching Powell, he observed that his left ear was almost torn off; his skull was laid open exposing his brain; his nose so badly mashed as not to be recognizable; his jaw hanging in such manner as to indicate it was broken; and his head having a hole in the back through which blood flowed.

Since Powell was still breathing, the owner asked him several times who had beaten him. Powell's efforts to answer were failures. It was then about 3:30 in the morning, and shortly thereafter Powell was taken by ambulance to the hospital where he died before the doctor arrived to attend him. According to the doctor, death had resulted from injuries to the brain caused by the impact of a blunt instrument such as a ball peen hammer or pipe wrench.

Investigation at the scene revealed what appeared to be spots of blood on the door knob where Jones made his exit. Other spots were found nearby. The police went to Jones' home and arrested him. A pair of shoes under his bed had snow on them and some stains which were later found to be dried blood. An examination of his car brought to light what appeared to be blood stains on the steering wheel and the interior. Similar spots were discovered on the sidewalks, back porch and in the kitchen sink of Jones' home.

Jones was placed in jail at about 4:20 that morning. In the afternoon he was questioned, and at about 4 o'clock he signed a statement, the pertinent part of which is as follows:

"* * * Dave was sitting on a stool behind the main desk and I was standing in the space between the cash register stand and the desk. While we were talking I pulled the hammer out of my coat pocket with my right hand and hit Dave on the head with it. He stum-

bled and fell off of the stool. I believe the hammer broke at that time because I just hit him once with the hammer. It was a small ball peen hammer. He fell to the floor and made one attempt to get up. I went around the counter behind the desk and noticed a pipe wrench under the counter. It was a wrench about 18 inches long. I picked it up and hit him on the head again about two more times when he made an attempt to get up. I do not remember that he said anything. I then went to the cash drawer behind the desk and took the money out of it. I then went to the cash register and punched a button and it opened and I took the money out of it. I then again went behind the desk and took the money that was in a little bowl under the counter. I put the money in my pocket and left the hotel by the same door I had come in."

At the time Jones made this statement he was unaware that Powell was dead. The police did not apprise him of the fact that Powell had died within about one-half hour after the blows had been inflicted upon him.

In the confession Jones advised the police where he had cached the money taken from the hotel. By reason of this disclosure the money was found and recovered. It had been placed in containers owned by Jones in a box in the alley to the rear of his home.

To the charge of murder Jones pled not guilty and not guilty by reason of insanity. After the entry of these pleas the court ordered him taken to the state hospital for observation. In due time the result of this examination was reported to the court, it being the opinion of the psychiatrists that he was presently sane and "legally sane at the time of the alleged commission of the crime."

Thereafter the court granted Jones' motion for an examination by Dr. Tepley of Denver, and over objection, a motion by the district attorney that Jones be examined by Dr. Schapire of the Colorado Psychopathic Hospital in Denver. Dr. Tepley made his report to the

court, advising that Jones was at the time and "is now legally sane," "was able to distinguish right from wrong," but that he needed additional information to determine "whether he was able to refrain from doing wrong once the impulse had arisen in him or been given to him."

Prior to trial Jones withdrew his plea of not guilty by reason of insanity. The cause proceeded to trial on the charge of murder and the plea thereto of not guilty.

In the course of the trial the court admitted in evidence a photograph of Powell taken sometime before this occurrence, a photograph of Jones taken shortly after his arrest, and Powell's blood-stained shirt, all over the objection of Jones. The shirt had been removed from Powell's body at the mortuary. Tests revealed that the blood on the shirt was the same type as other blood samples appearing on other articles introduced in evidence having blood stains.

After the trial had commenced, attorneys for Jones learned that Dr. Tepley had sustained personal injuries in an accident and would be unavailable as a witness, although he had assured them previously that he would be present during the trial. Apparently such injuries were sustained shortly after the trial started and were complicated by fever and other illness resulting therefrom. As a protective measure, attorneys for Jones obtained a subpoena directing Dr. Tepley to appear as a witness in the case.

Counsel then suggested that the case be continued in order to give them time to obtain the services of another psychiatrist or that it be continued to a date when Dr. Tepley could testify personally or by deposition. Affidavits of attending physicians were later filed showing the incapacity of Dr. Tepley.

By affidavit Dr. Tepley advised the court that, if he could testify, he would give it as his opinion that Jones "was not able to form an intent to murder; and that the robbery could not have been attempted by Jones but

for the overpowering effect of excessive alcohol superimposed upon the schizoid type of mind possessed by said Jones."

The court, upon the advice of the district attorney, concluded that the two psychiatrists who had observed and examined Jones on behalf of the State would in great measure testify to the same effect as would Dr. Tepley if the latter were in a condition to testify, and refused a continuance for any of the purposes proposed.

These two doctors were called by Jones, and both testified that defendant was legally sane at the time of the offense. Both agreed that he had personality disorders which were probably aggravated by the influence of alcohol at the time of the crime. Dr. Schapire said that Jones' judgment was severely impaired at the time of the crime and that the circumstances surrounding the act bore "the earmarks of a sudden impulsive sort of action rather than real premeditated action . . ."; that Jones "did know what he was doing" but that he may not "have been able to resist his impulse to engage in criminal activity" and "may have chosen to disregard the certain consequences of his action." He further opined that Jones went to the hotel with the intent to rob. Dr. Waggoner, the other psychiatrist, entertained the opinion that defendant did not have the intent to kill at the time of the act but had the intent to knock down and rob Powell.

Certain instructions were tendered by the defendant and refused by the court, and others were given by the court over the objection of Jones. These instructions will be discussed later in this opinion. The court submitted instructions and permitted the case to go to the jury on first degree murder with alternatives of death or life imprisonment; second degree murder; and not guilty.

While the jury was deliberating it sent the following question to the court: "Does life imprisonment mean the defendant will spend the rest of his life in prison?" It

had already been given a stock instruction on the penalties to be inflicted in the event of first degree murder, and the court stated that, since life imprisonment has a clear meaning, no further instruction should be given to the jury.

Seventeen alleged grounds of error are assigned for reversal. Inasmuch as they conveniently fall into categories, we will group those containing kindred assertions of error and thus consider them. So treated, we must determine:

1. Whether the case made by the people was circumstantial in quality (a) because, it is contended, the statement of Jones does not constitute a confession of the crime of murder; hence, (b) the trial court should have given the tendered instruction based upon circumstantial evidence, and (c) should not have given the instruction it did, permitting imposition of the death penalty; wherefore, (d) the trial court should have granted Jones' motion to set aside the death penalty.

█ Counsel for Jones argue that the statement is a confession of the crime of robbery, but that it is not a confession of the crime of murder, since Jones "did not know, nor was he informed, that Powell had died," and further, the statement does not amount to an admission that he killed Powell. They further maintain that its only value arises from the fact that it is proof that Jones hit Powell, but not that the blow caused his death.

Accordingly, this statement being at most a "declaration against interest," and not a confession, their argument pursues the logical course that the case made by the people is wholly circumstantial, that there is no direct evidence of the commission of the offense. The only eyewitness other than Jones, they point out, was the bellboy, and he was asleep during the time Powell sustained his mortal injuries. Hence, according to them, the statement of Jones was not a voluntary confession of murder.

"Voluntary" is a term not always to be used in con-

tradistinction to "compulsory." *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035, 70 L.R.A. 33, 3 Ann. Cas. 513. In a proper setting an element of voluntariness of a confession may involve knowledge of the death of the person in order to sustain it as a confession of the crime of murder. Thus, one may admit that he struck a person with his fist, but, not knowing that the person died as a result thereof, may not by his statement have confessed to the commission of a homicide.

But if the natural consequences of his unlawful act were such that death would likely ensue, a statement that he struck a person violent blows from which the victim later died would be a damning confession. *State v. Jordan,* 146 Ore. 504, 30 P. (2d) 751. The nature of the acts of violence thus has an important bearing on the question of knowingly acknowledging guilt. A consideration of the evidence in this case induces the conviction that the natural and probable consequence of the injuries inflicted upon Powell was death.

An ingredient of the felony murder now under consideration is the taking of the money in the custody of Powell by force and violence. Jones acknowledges so doing in his signed statement. "A confession is an acknowledgment in express words, by the accused in a criminal case, of the truth of the guilty fact charged or of *some essential part of it . . .*" (Emphasis supplied.) *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111.

We hold that Jones' signed statement was a confession, and that, since there was corroborating evidence relating to its contents, the case is removed from the operation of C.R.S. '53, 40-2-3, regarding a conviction based upon circumstantial evidence alone as foreclosing the infliction of the death penalty. *Williams v. People,* 114 Colo. 207, 158 P. (2d) 447.

2. Whether the trial court erred (a) in granting the motion of the district attorney for a psychiatric examination of Jones by Dr. Schapire after Jones already had been committed and observed pursuant to C.R.S. '53,

39-8-2, which (b) is the exclusive procedure afforded the state when a plea of not guilty by reason of insanity is made, and which may not be expanded without contravening federal and state constitutional provisions forbidding compulsion of a person to testify against himself in a criminal case.

■ *Early v. People*, 142 Colo. 462, 352 P. (2d) 112, made manifest that the procedure outlined in C.R.S. '53, 39-8-2, is not exclusive where an accused enters a plea of not guilty by reason of insanity. At the same time, it contained an admonition against indiscriminate direction by a trial court of additional observations and examinations, intimating that such could result in an abuse of judicial power.

A diligent study of the record in this case leads to the conclusion that the action of the trial court in ordering the examination by Dr. Schapire was within the permissible bounds of the Early case, and did not offend in the respects wherein this court sounded warnings that the power to order observation and examination could be misused to the prejudice of the accused.

An additional and stronger reason for our determination that no predicable error exists in this regard grows out of the fact that the plea of not guilty by reason of insanity was withdrawn by Jones before trial. These observations and examinations were ordered as a result of such plea. When the plea of not guilty by reason of insanity was withdrawn, Dr. Schapire was advised by the district attorney that his presence as a witness was not needed.

Only after it was learned that Dr. Tepley would be unavailable as an expert witness did the need for Dr. Schapire revive. Most reluctantly did Jones have him testify. And he was required to testify concerning the ability of Jones to intend, deliberate and premeditate the commission of robbery and homicide. That his testimony raised serious doubts about such ability was favorable to Jones in meeting the substantive charge,

although, as will be made to appear, intent, deliberation and premeditation were not properly issues to be tried.

■ 3. Whether the trial court erred (a) in refusing a continuance of the trial for the purpose of awaiting the ability of Dr. Tepley to appear and testify or of having his deposition taken, he having suffered disabling accidental injuries and consequent illness after the trial commenced, and who would have given as his opinion, based upon extended examination of Jones, that Jones had not the ability to form the intent to commit the crime; and (b) in being unduly persuaded that the psychiatrists for the State could as well, or better, testify to the same effect, thereby putting Jones to great disadvantage in having to resort to such psychiatrists to prove the point.

Our consideration of this asserted error will be divided into two sections. We will first determine the problem per se as presented. Then we will resolve a tangential problem not directly raised but which duty compels us to notice and decide.

*The problem per se.* The record discloses that Dr. Tepley, had he been able to testify personally or by deposition, would have expressed the opinion that Jones "was not able to form an intent to murder; and that the robbery could not have been attempted by Jones but for the overpowering effect of excessive alcohol superimposed upon the schizoid type of mind possessed by Jones." This testimony would have been of value if ability to form a specific intent is a necessary ingredient of either a felony murder or a robbery.

Forming a part of every offense is the ordinary or general criminal intent mentioned in C.R.S. '53, 40-1-1. Certain violations embody as part of their essence a particular or specific intention. *Brennan v. People,* 37 Colo. 256, 86 Pac. 79. These distinctions become important, for a "defendant who does not thus plead not guilty by reason of insanity shall not be permitted to rely on insanity as a defense to any accusation of crime; pro-

vided, however, that evidence of mental condition may be offered in a proper case as bearing upon the capacity of the accused *to form the specific intent essential to constitute a crime."* (Emphasis supplied.) C.R.S. '53, Cum. Supp. '57, 39-8-1.

"All murder * * * which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem or burglary * * * shall be deemed murder of the first degree * * *" C.R.S. '53, 40-2-3. It will be noted that a particular or specific intent to kill is not an integrant of murder committed in the perpetration of a robbery. "[T]he statute makes the taking of human life in an attempt to perpetrate a robbery murder in the first degree * * * without regard to the questions of intent, premeditation, or deliberation." *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031; cf. *Silliman v. People,* 114 Colo. 130, 162 P. (2d) 793; *Early v. People,* supra.

Robbery is defined in C.R.S. '53, 40-5-1, as "the felonious and violent taking of money, goods or other valuable thing from the person of another by force or intimidation." The section then grades the crime of robbery and fixes penalties for the various grades. It will be noted that specific intent is not made a part of the definition of robbery.

██ Specific intent, therefore, is not a necessary element in the proof of the offense of robbery. *Funk v. People,* 90 Colo. 167, 7 P. (2d) 823. It follows that the question of mental capacity to form intent is of no relevance in this case. Conceivably there may be a felony in which specific intent is essential, and in the perpetration of which a homicide is committed, but robbery is not such a felony.

██ The legislature "has declared that murder committed in the perpetration of the named felonies is murder in the first degree. The prosecution is required to prove the homicide beyond a reasonable doubt and is also required to establish to the same degree of proof the commission of the named felony and the commission

of the homicide in the perpetration of said felony."
*Early v. People,* supra.

■ In this case proof of the robbery and the homicide in the perpetration thereof satisfied the statute. Therefore, evidence relating to capacity to form an intent to rob or an intent to kill was of no consequence on the question of guilt, and Dr. Tepley's testimony would not have been admissible as bearing on that issue.

■ *Problem not directly raised.* By C.R.S. '53, 40-2-3, the jury is empowered to fix the penalty at life imprisonment or death in the event it determines that the defendant is guilty of first degree murder. Concerning this power of the jury, this court spoke these words in the case of *Shank v. People,* 79 Colo. 576, 247 Pac. 559:

"The general assembly, acting within its province, determined that the death penalty was proper in some cases of first degree murder. The designation thereof it *vested in the discretion of jurors.* Its purpose to have that *discretion* exercised according to the facts is evident." (Emphasis supplied.)

In the exercise of this discretion, the jury may consider mitigating as well as aggravating circumstances surrounding the commission of the homicide. *Abshier v. People,* 87 Colo. 507, 289 Pac. 1081.

C.R.S. '53, 40-2-20, in part provides that: "The killing being proved, the burden of proving circumstances of mitigation, * * * will devolve on the accused * * *."

Under this section, the killing having been established, the burden of proving the effect of Jones' mental condition as a mitigating circumstance in the perpetration of the killing fell upon Jones. *Shank v. People,* supra. If the jury had had Dr. Tepley's testimony for its consideration, it might have been moved, in the exercise of its discretion, to impose a life sentence rather than death. *Babcock v. People,* 13 Colo. 515, 22 Pac. 817.

The testimony of Dr. Tepley was pertinent as it might affect the jury's discretion in connection with fixing the penalty for the crime. Hence, "in the exercise of

its discretion to choose between the two modes of punishment for first degree murder prescribed by the statute," it would have been the duty of the jury to weigh and consider such evidence as well as all the other evidence in the case. *Leopold v. People,* 105 Colo. 147, 95 P. (2d) 811. In this respect, we believe the court should have granted a continuance, either to permit Jones to obtain the deposition of Dr. Tepley or to provide for his presence at the trial of the cause.

4. Whether the trial court "erred in permitting the prosecution to exhibit blood-stained clothing and articles before the jury prior to their admission in evidence, and in admitting the State's exhibits G, O and V, a picture of the deceased, a picture of the defendant, and a blood-stained shirt of the deceased respectively."

■ We are persuaded that the admission of the picture of Powell could not prejudice the defendant. Exhibit G, the picture of Powell, was identified and was said to be a likeness of the decedent prior to the infliction of the blows upon him. Exhibit O was a picture of Jones taken after his arrest. This picture neither proved nor disproved any matter in issue. Evidence having no probative value should not be received in evidence. The probability that its reception in evidence and its consideration by the jury is non-prejudicial does not alter the rule. Such probability is not certainty, and the possibility that it may have in some manner influenced the jury provokes condemnation of its reception.

■ If Powell's blood-stained shirt had been received in evidence merely as a shirt in such condition, there might be some merit to the objection, but the blood on the shirt, in connection with the several other blood-stained articles admitted in evidence, was submitted for consideration because the blood on them indicated that it came from a person having the type of blood possessed by Powell. Offered and admitted

for such purpose, it presents nothing upon which Jones may base error.

5. Whether the trial court erred in (a) giving its instruction No. 9 defining deliberation and premeditation, and (b) refusing to give Jones' tendered instruction No. 1, defining these terms.

▆▆▆ Since this is a felony murder and since deliberation and premeditation are not elements thereof, what we have said in discussing intent, deliberation and premeditation under a previous heading applies with equal force to the matters here raised. In giving an instruction on deliberation and premeditation, the trial court gave Jones an advantage to which he was not entitled under the law. No error based upon the stock instruction defining deliberation and premeditation can be asserted, and no error can be asserted based upon the court's refusal to give an instruction which would have directed the jury that the terms "deliberation" and "premeditation" imply the lapse of "some appreciable length of time," because deliberation and premeditation are not ingredients of a murder perpetrated in the commission of a felony.

6. Whether the trial court erred in charging the jury in accordance with C.R.S. '53, 40-2-3, that "all murder which is committed in the perpetration of, or attempt to perpetrate robbery, shall be deemed murder in the first degree, and if you find from the evidence, beyond a reasonable doubt, that the defendant committed the homicide charged in the information, and further find from the evidence, beyond a reasonable doubt, that said homicide was committed in the perpetration of, or attempt to perpetrate robbery, as defined in these instructions, then the elements of malice, deliberation, premeditation and intent are not necessary elements of first degree murder, and need not be proved," without further advising the jury in the words of the statute defining felony murder that the "jury before which any person indicted for murder shall be tried, shall, if

it finds such person guilty thereof, designate by its verdict whether it be murder of the first or second degree * * *."

Here the trial court erroneously gave an instruction on second degree murder, but the error was favorable to this defendant. An instruction on second degree murder is improper where, by the evidence, the crime was perpetrated in the commission of one of the felonies enumerated in C.R.S. '53, 40-2-3, for in such circumstances the verdict must be first degree murder or acquittal. *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103.

As in this case, it was the position of defense counsel in the cited case "that in a murder trial, no matter what the evidence is, and even where there is no evidence whatever tending to show second degree murder, the trial court must instruct on murder of the second degree." This contention was rejected in that case, and we must reject it here.

7. Whether the trial court erred in not defining the phrase "life imprisonment" when the jury requested such information after it started its deliberation preparatory to the rendition of its verdict.

The trial court had given its charge to the jury and the jury had retired to deliberate. In the course of its deliberations the jury submitted a written question to the court, asking: "Does life imprisonment mean the defendant will spend the rest of his life in prison?" In deciding not to answer the question, the court reasoned that life imprisonment had a clear meaning and that any further instruction would be placing before the jury matters which were clearly outside its province.

We believe the ruling of the trial court was correct. An analogous situation was presented to the trial court in the case of *Sukle v. People,* 107 Colo. 269, 111 P. (2d) 233. The question there posed involved the eligibility of the accused for parole. Concerning the question, this court said:

"We think the subject of the jury's inquiry was not

of their proper concern, and the court's advise thereon, even with the consent of counsel, given in their presence, was highly improper. Refusal of defendant's counsel to consent to the action of the court, in the circumstances appearing, would have been fraught with grave peril to his client. In necessary sequence, the statute considered, the jury had to determine: (1) Whether defendant was guilty of murder; (2) if guilty, whether of the first or the second degree; and (3) if of the first degree, whether the punishment should be life imprisonment or death. In arriving at a conclusion on the several questions calling for jury determination, the circumstances considered, the law required the jury to act on the history and facts of the case as disclosed by the evidence, and upon no other consideration. In importance, the extent of the punishment in a murder case is second only to the question of guilt; and once the jury determines that guilt has been established in the first degree, what the penalty shall be — solely of jury solution — becomes the prime question. The information which the jury elicited from the court, was applicable only in the event punishment was fixed at life imprisonment. It undoubtedly encouraged the jury to speculate on what the chief executive of the state, at some future time, acting pursuant to authority of law apart from the law under which the jurdiciary proceeds, might then conclude justice required at his hands. Prejudicial error is obvious."

If the jury had in mind time off for good behavior, it is of interest to note that in *Prater v. State,* 131 Tex. Cr. 35, 95 S.W. (2d) 971, the court held that no prejudicial error resulted from the trial court's refusal to answer the jury's query as to the effect of a pardon or time off for good behavior on a life sentence.

The original opinion herein is withdrawn and this opinion substituted therefor. The judgment is reversed and a new trial ordered.

Mr. Justice Doyle concurs in the result only.

Mr. Justice McWilliams not participating.

Mr. Justice Doyle specially concurs:

My special concurrence herein is based upon the premise adopted by the majority that intent is not an ingredient of felony murder involving robbery. If intent is an essential element of robbery, it would have to be proved in order to establish beyond a doubt that murder was committed incident to a robbery.

I must confess that I have not fully researched this question. However, I have always assumed that intent is a necessary element of robbery, and without looking at the hornbooks or the cyclopedias, I am confident that they hold this to be true whether the crime be simple robbery or aggravated robbery. The case of *Wechter v. People,* 53 Colo. 89, 124 Pac. 183, inferentially holds this. It clearly recognizes that one who seeks to obtain his own property by force is not guilty of robbery. The principle clearly appears in *People v. Gallegos,* 130 Colo. 232, 274 P. (2d) 608. There defendant used force to obtain money from the prosecuting witness and asserted that it was under a claim of right to the money. The Court explains that robbery is merely an aggravated form of larceny and that it requires intent to steal. The issue was carefully considered and explained in *Gallegos* and it appears to me sufficient to merely quote from the well reasoned opinion of Mr. Justice Alter which stated:

"Counsel for defendant does not contend that in thus securing the payment of his wages no crime was committed, nor did the trial court so determine. The only question presented on this review is whether, under the facts, defendant was guilty of aggravated robbery as to which the trial court held him guiltless.

"Gallegos, in his defense in the trial court, relied upon, and the basis of his motion was, our opinion in *Analytis v. People,* 68 Colo. 74, 188 Pac. 1113. We have read and

carefully considered the record in that case and have concluded that the decision there is determinative of the matter presented in the instant proceeding, and amply supported the trial court's disposition of this case.

"We are aware of the fact that there is a divergence of opinion in robbery cases, and in *Moyers v. State*, 186 Ga. 446, 197 S.E. 846, there is a nicety of distinctions which we are disinclined to adopt in this jurisdiction. However, it is to be noted that in that case is the statement, 'If the animus furandi is lacking in the taking, there can be no robbery. So our courts have held the taking of property under a fair claim of right of possession does not constitute robbery.' Also it should be observed that in the Georgia case the word 'fraudulent' is used in the definition of robbery, and its absence in our jurisdiction is to be noted.

" 'Animus furandi' is a latin phrase which generally may be translated as intent to steal, that is, a criminal intent or an intent to feloniously deprive an owner of his property.

"In the Analytis case, supra, we cited the court's opinion in *State v. Hollyway*, 41 Ia. 200, and therein is to be found the following: 'If it be not robbery to forcibly take property from another as security for that to which the defendant in good faith lays claim as the owner thereof, we do not see how it can be said to be robbery where the defendant by putting in fear compels his debtor to pay that which the defendant in good faith believes to be a just and honest debt then due. The felonious intent is wanting in the latter as well as the former case. There is no fraud or injury intended in either case. The intent in both is to obtain that which he believes to be his and nothing more. This rebuts the inference of a felonious intent that would arise from the forcible and unlawful taking.'

"Under the Analytis case, supra, it is settled law in Colorado — and we believe it to be the law in all but a few other jurisdictions — that when a creditor takes

money from his debtor in satisfaction of an obligation, even though in so doing he uses force or intimidation, it cannot be regarded as robbery for it is the generally accepted doctrine that where property is taken under a bona fide claim of right the requisite animus furandi is lacking.

"It may generally be said that the offense of robbery is but an aggravated form of larceny, and, therefore, the intent to deprive an owner of his property and to convert it to the use and benefit of the accused is an essential element of the offense and must be established beyond a reasonable doubt by competent evidence. In the present case it is undisputed that the intent to steal is absent, and this being a substantive element in the commission of the crime of robbery, its absence precludes a successful prosecution therefor. * * *"

See also *Stewart v. U. S.*, 214 Fed. 2d 879.

I am satisfied that intent is part of robbery, either simple or aggravated, and that it does not get lost in the shuffle, so to speak, when the robbery becomes merged in a homicide. It is undoubtedly true that the prosecution need not prove express malice as part of the murder prosecution in a robbery-murder case. This does not mean that the prosecution need not prove the robbery. If at least prior intent to rob or to steal by force must be proven, it would follow that a defendant who is incapable of entertaining a prior criminal intent to rob or to steal by force could not be successfully prosecuted as a felony murderer. Therefore, these are the considerations which persuade me that the trial court was correct in ruling evidence as to intent to be germane to the issue before the court.

I concur in the result for the reasons stated. It is my view that ordinary fairness demanded that the accused be given an opportunity to present his testimony. He was deprived of that opportunity and on this account the case should be reversed and remanded.