# CALIFORNIA *v.* RAMOS

No. 81–1893.  Argued February 22, 1983—Decided July 6, 1983

*Harley D. Mayfield,* Deputy Attorney General of California, argued the cause for petitioner. With him on the brief were *George Deukmejian,* Attorney General, *Robert Philibosian,* Chief Assistant Attorney General, *Daniel J. Kremer,* Assistant Attorney General, and *Jay M. Bloom,* Deputy Attorney General.

*Ezra Hendon,* by appointment of the Court, 459 U. S. 964, argued the cause and filed a brief for respondent.

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to consider the constitutionality under the Eighth and Fourteenth Amendments of instructing a capital sentencing jury regarding the Governor's power to commute a sentence of life without possibility of parole. Finding no constitutional defect in the instruction, we reverse the decision of the Supreme Court of California and remand for further proceedings.

I

On the night of June 2, 1979, respondent Marcelino Ramos participated in the robbery of a fast-food restaurant where he was employed as a janitor. As respondent's codefendant placed a food order, respondent entered the restaurant, went behind the front counter into the work area ostensibly for the purpose of checking his work schedule, and emerged with a gun. Respondent directed the two employees working that night into the restaurant's walk-in refrigerator and ordered them to face the back wall. Respondent entered and emerged from the refrigerator several times, inquiring at one point about the keys to the restaurant safe. When he entered for the last time, he instructed the two employees to

kneel on the floor of the refrigerator, to remove their hats, and to pray. Respondent struck both on the head and then shot them, wounding one and killing the other.

Respondent was charged with robbery, attempted murder, and first-degree murder. Defense counsel presented no evidence at the guilt phase of respondent's trial, and the jury returned a verdict of guilt on all counts. Under California law, first-degree murder is punishable by death or life imprisonment without the possibility of parole where an alleged "special circumstance" is found true by the jury at the guilt phase.[1] At the separate penalty phase, respondent presented extensive evidence in an attempt to mitigate punishment.[2] In addition to requiring jury instructions on aggravating and mitigating circumstances,[3] California law requires that the trial judge inform the jury that a sentence of life imprisonment without the possibility of parole may be commuted by the Governor to a sentence that includes the possibility of parole.[4] At the penalty phase of respondent's trial, the judge delivered the following instruction:

> "You are instructed that under the State Constitution a Governor is empowered to grant a reprieve, pardon, or

---

[1] See Cal. Penal Code Ann. § 190.2 (West Supp. 1983). The alleged special circumstance found true in respondent's case was commission of the murder during the course of a robbery. § 190.2(a)(17)(i).

[2] Respondent offered evidence to show, *inter alia*, that his adoptive parents had died while he was young, that he then came under the bad influence of his codefendant, that respondent had mild congenital brain damage, a low intelligence quotient, and borderline schizophrenia, that he was under the influence of alcohol and drugs at the time of the offenses, and that he intended only to "graze" the victims when he shot them.

[3] The jury "shall impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances" and "shall impose" a sentence of life without possibility of parole if the mitigating circumstances outweigh the aggravating circumstances. Cal. Penal Code Ann. § 190.3 (West Supp. 1983).

[4] *Ibid.* This instruction, referred to hereinafter as the "Briggs Instruction," was incorporated into the California Penal Code as a result of a 1978 voter initiative popularly known as the Briggs Initiative.

commutation of a sentence following conviction of a crime.

"Under this power a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." Tr. 1189–1190.[5]

The jury returned a verdict of death.

On appeal the Supreme Court of California affirmed respondent's conviction but reversed the death sentence, concluding that the Briggs Instruction required by Cal. Penal Code Ann. § 190.3 (West Supp. 1983) violated the Federal Constitution. 30 Cal. 3d 553, 639 P. 2d 908 (1982). The court found two constitutional flaws in the instruction. First, it invites the jury to consider factors that are foreign to its task of deciding whether the defendant should live or die. According to the State Supreme Court, instead of assuring that this decision rests on "consideration of the character and record of the individual offender and the circumstances of the particular offense," *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976), the instruction focuses the jury's attention on the Governor's power to render the defendant eligible for parole if the jury does not vote to execute him and injects an entirely speculative element into the capital sentencing determination. Second, the court concluded that because the instruction does not also inform the jury that the Governor possesses the power to commute a death sentence, it leaves the jury with the mistaken belief that the only way to keep the defendant off the streets is to condemn him to death. Accordingly, the court remanded for a new penalty phase.[6]

---

[5] The trial judge gave the instruction over the objection of respondent on the ground that the instruction was mandated by legislation. Tr. 718.

[6] In dissent Justice Richardson concluded that the Briggs Instruction was harmless and nonprejudicial because it merely informs jurors of information that is a matter of common knowledge. Further, the instruction is relevant because the issue of parole is injected into the sentencing process

We granted certiorari, 459 U. S. 821 (1982), and now reverse and remand.[7]

## II

In challenging the constitutionality of the Briggs Instruction, respondent presses upon us the two central arguments

by one of the alternative punishments the jury must consider: life imprisonment without possibility of parole.    In addition, the dissent concluded that the instruction's failure also to inform the jury of the Governor's power to commute a death sentence did not render it constitutionally infirm.    In *People* v. *Morse*, 60 Cal. 2d 631, 388 P. 2d 33 (1964), the court had held, on the basis of its supervisory powers, that jurors should not be instructed that a death sentence could be commuted because it reduced the jury's sense of responsibility in imposing a capital sentence.    Therefore, the Briggs Instruction should not be struck down because it fails to require an instruction of the type condemned in *Morse*.

[7] The Supreme Court of California also concluded that certain testimony by the defense psychiatrist was inadmissible as a matter of state evidence law.    Over defense objection, at the penalty phase the prosecutor had been allowed to elicit on cross-examination of the psychiatrist that respondent was aware of the Governor's power to commute a life sentence without parole to a lesser sentence that included the possibility of parole. According to the psychiatrist, respondent had indicated that, were he to be released on parole after 10 or 20 years in prison, "he would probably have built up within himself such feelings of anger and frustration that he would attempt to take revenge on anyone involved in the trial, including the district attorney who prosecuted the case, the judge who presided over it, and the jurors who voted to convict him."    30 Cal. 3d 553, 598, 639 P. 2d 908, 934 (1982) (footnote omitted).    The State Supreme Court ruled that the trial court had abused its discretion in admitting this testimony because the prejudice created by admission of the testimony outweighed its probative value.    See Cal. Evid. Code Ann. § 352 (West 1966).

Respondent argues that this Court should not reach the constitutional issues raised by the State because the above ruling represents a *possible* adequate and independent state ground for the State Supreme Court's decision to reverse the death sentence.    We find no bar to reaching the federal questions.    The State Supreme Court quite clearly rested its reversal of the death sentence solely on the Federal Constitution.    30 Cal. 3d, at 562, 600, 639 P. 2d, at 912, 936.    Moreover, with respect to its ruling on the evidentiary question, the court did not determine whether this error warranted reversal of the death penalty.    It held only that the testimony "should not be admitted if the penalty phase is retried."    *Id.*, at 598, n. 22,

advanced by the Supreme Court of California in its decision. He contends (1) that a capital sentencing jury may not constitutionally consider [8] possible commutation, and (2) that the Briggs Instruction unconstitutionally misleads the jury by selectively informing it of the Governor's power to commute one of its sentencing choices but not the other. Respondent's first argument raises two related, but distinct concerns— viz., that the power of commutation is so speculative a factor that it injects an unacceptable level of unreliability into the capital sentencing determination, and that consideration of this factor deflects the jury from its constitutionally mandated task of basing the penalty decision on the character of the defendant and the nature of the offense. We address these points in Parts II–B and II–C, *infra*, and respondent's second argument in Part III, *infra*. Before turning to the specific contentions of respondent's first argument, however, we examine the general principles that have guided this Court's pronouncements regarding the proper range of considerations for the sentencer in a capital case.

## A

The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a cor-

---

639 P. 2d at 934, n. 22. Therefore, the adequacy of this ruling to support reversal of the sentence was not addressed by the state court. See *Michigan* v. *Long, post*, p. 1032. Of course, on remand from this Court, the state court is free to determine whether as a matter of state law this evidentiary error is a sufficient basis for reversing the death sentence.

In addition, the Supreme Court of California expressly declined to decide whether the Briggs Instruction independently violates any provisions of the State Constitution. 30 Cal. 3d, at 600, n. 24, 639 P. 2d, at 936, n. 24. As with the evidentiary issue, of course, the state court may address this question on remand.

[8] The Supreme Court of California construed the Briggs Instruction as inviting capital sentencing juries to *consider* the commutation power in its sentencing determination. See *id.*, at 599–600, 639 P. 2d, at 935–936. We view the statute accordingly.

respondingly greater degree of scrutiny of the capital sentencing determination.[9] In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty. In *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and its companion cases,[10] the Court reviewed the capital sentencing schemes of five States to determine whether those schemes had cured the constitutional defects identified in *Furman* v. *Georgia*, 408 U. S. 238 (1972). In *Gregg* itself, the joint opinion of JUSTICES Stewart, POWELL, and STEVENS concluded that the Georgia sentencing scheme met the concerns of *Furman* by providing a bifurcated proceeding, instruction on the factors to be considered, and meaningful appellate review of each death sentence. 428 U. S., at 189–195. Satisfied that these procedural safeguards "suitably directed and limited" the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action," *id.*, at 189, the joint opinion did not undertake to dictate to the State the particular *substantive* factors that should be deemed relevant to the capital sentencing decision. Indeed, the joint opinion observed: "It seems clear that the problem [of channeling jury discretion]

---

[9] See *Eddings* v. *Oklahoma*, 455 U. S. 104, 117–118 (1982) (O'CONNOR, J., concurring); *Beck* v. *Alabama*, 447 U. S. 625, 637–638 (1980) (opinion of STEVENS, J., joined by BURGER, C. J., and BRENNAN, Stewart, BLACKMUN, and POWELL, JJ.); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (opinion of BURGER, C. J., joined by Stewart, POWELL, and STEVENS, JJ.); *Gardner* v. *Florida*, 430 U. S. 349, 357–358 (1977) (opinion of STEVENS, J., joined by Stewart, and POWELL, JJ.); *id.*, at 363–364 (WHITE, J., concurring in judgment); *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

[10] *Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976); *Woodson* v. *North Carolina*, *supra* (plurality opinion); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976) (plurality opinion).

will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant *that the State, representing organized society, deems particularly relevant to the sentencing decision.*" *Id.*, at 192 (emphasis added). See also *id.*, at 176 ("The deference we owe to the decisions of the state legislatures under our federal system . . . is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy'").[11]

It would be erroneous to suggest, however, that the Court has imposed no substantive limitations on the particular factors that a capital sentencing jury may consider in determining whether death is appropriate. In *Gregg* itself the joint opinion suggested that excessively vague sentencing standards might lead to the arbitrary and capricious sentencing patterns condemned in *Furman.* 428 U. S., at 195, n. 46.[12] Moreover, in *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), the plurality concluded that a State must structure its capital sentencing procedure to permit consideration of the

---

[11] Moreover, in approving the sentencing schemes of Georgia, Florida, and Texas, the joint opinions of JUSTICES Stewart, POWELL, and STEVENS did not substitute their views for those of the state legislatures as to the particular substantive factors chosen to narrow the class of defendants eligible for the death penalty. For example, under the Georgia scheme examined in *Gregg*, at least 1 of 10 specified aggravating circumstances must be found beyond a reasonable doubt before the jury may consider whether death is the appropriate punishment for the individual defendant. 428 U. S., at 164–165. By contrast, under the Texas scheme approved in *Jurek* v. *Texas, supra,* the State attempted to limit the category of defendants upon whom the death sentence may be imposed by narrowing capital homicides to intentional and knowing murders committed in five particular situations. See *id.*, at 268. In upholding the Texas scheme, the joint opinion observed: "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose." *Id.*, at 270.

[12] Cf. *Godfrey* v. *Georgia,* 446 U. S. 420 (1980) (reversing death sentence that rested on unconstitutionally broad and vague construction of an aggravating circumstance).

*individual* characteristics of the offender and his crime.[13] This principle of individualization was extended in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), where the plurality determined that "the Eighth and Fourteenth Amendments require that the sentencer [in a capital case] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* at 604 (emphasis in original; footnotes omitted).[14] Finally, in *Gardner* v. *Florida,* 430 U. S. 349 (1977), a plurality of the Court held that a death sentence may not be imposed on the basis of a presentence investigation report containing information that the defendant has had no opportunity to explain or deny.

Beyond these limitations, as noted above, the Court has deferred to the State's choice of substantive factors relevant to the penalty determination. In our view, the Briggs Instruction does not run afoul of any of these constraints.

## B

Addressing respondent's specific arguments, we find unpersuasive the suggestion that the possible commutation of a life sentence must be held constitutionally irrelevant[15] to the

---

[13] "[W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson, supra,* at 304. See also *Gregg* v. *Georgia,* 428 U. S., at 189 (quoting *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937)).

[14] See also *Zant* v. *Stephens,* 462 U. S. 862, 879 (1983); *id.,* at 900 (REHNQUIST, J., concurring in judgment); *Enmund* v. *Florida,* 458 U. S. 782, 798 (1982); *id.,* at 827–828 (O'CONNOR, J., dissenting); *Eddings* v. *Oklahoma,* 455 U. S., at 110–112; *id.,* at 118 (O'CONNOR, J., concurring); *id.,* at 121–122 (BURGER, C. J., dissenting).

[15] See also 30 Cal. 3d, at 596, 639 P. 2d, at 933 ("[The Briggs Instruction] injects into the sentencing calculus an entirely irrelevant factor . . ."); *id.,* at 600, 639 P. 2d, at 935.

sentencing decision and that it is too speculative an element for the jury's consideration.　On this point, we find *Jurek* v. *Texas*, 428 U. S. 262 (1976), controlling.

The Texas capital sentencing system upheld in *Jurek* limits capital homicides to intentional and knowing murders committed in five situations.　*Id.*, at 268.　Once the jury finds the defendant guilty of one of these five categories of murder, the jury must answer three statutory questions.[16] If the jury concludes that the State has proved beyond a reasonable doubt that each question is answered in the affirmative, then the death sentence is imposed.　In approving this statutory scheme, the joint opinion in *Jurek* rejected the contention that the second statutory question—requiring consideration of the defendant's future dangerousness—was unconstitutionally vague because it involved prediction of human behavior.

> "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made.　Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. . . . And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.　For those sentenced to prison, these same predictions must be made by parole authorities.　The task that a Texas jury must perform in an-

---

[16] The questions are:

" '(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

" '(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

" '(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.'　Art. 37.071(b) (Supp. 1975–1976)."　428 U. S., at 269.

swering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." *Id.*, at 274–276 (footnotes omitted).

By bringing to the jury's attention the possibility that the defendant may be returned to society, the Briggs Instruction invites the jury to assess whether the defendant is someone whose probable future behavior makes it undesirable that he be permitted to return to society. Like the challenged factor in Texas' statutory scheme, then, the Briggs Instruction focuses the jury on the defendant's probable future dangerousness.[17] The approval in *Jurek* of explicit consideration of this factor in the capital sentencing decision defeats respondent's contention that, because of the speculativeness involved, the State of California may not constitutionally permit consideration of commutation.[18]

---

[17] This analogy between the matters raised in the jurors' minds by the Briggs Instruction and the Texas statutory factor of the defendant's future dangerousness is no "intellectual sleight of hand." *Post*, at 1029 (BLACKMUN, J., dissenting). To avoid this analogy is to ignore the process of thought that the Briggs Instruction inevitably engenders in the jury's deliberations. To be sure, the Briggs Instruction by its terms may incline their thoughts to the probability that the current or some future Governor might commute the defendant's sentence. Nevertheless, whatever the jurors' thoughts on this probability alone, the inextricably linked thought is whether it is desirable that this defendant be released into society. In evaluating this question, the jury will consider the defendant's potential for reform and whether his probable future behavior counsels against the desirability of his release into society.

[18] See also ABA Standards for Criminal Justice 18–2.5(c)(i) (2d ed. 1980) (giving as example of legitimate reason for selecting total confinement fact that "[c]onfinement is necessary in order to protect the public from further serious criminal activity by the defendant").

We also observe that, with respect to the relevance of the information conveyed by the Briggs Instruction, the issue of parole or commutation is

Nor is there any diminution in the reliability of the sentencing decision of the kind condemned in *Gardner* v. *Florida*, 430 U. S. 349 (1977). In *Gardner*, the Court reversed a death sentence that had been imposed in part on the basis of a confidential portion of a presentence investigation report that had not been disclosed to either the defendant or his counsel. Because of the potential that the sentencer might have rested its decision in part on erroneous or inaccurate information that the defendant had no opportunity to explain or deny, the need for reliability in capital sentencing dictated that the death penalty be reversed. *Gardner* provides no support for respondent. The Briggs Instruction gives the jury accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence.[19]

---

presented by the language used to describe one of the jury's sentencing choices—*i. e.*, life imprisonment without possibility of parole. The State of California reasonably could have concluded that, while jurors are generally aware of the Governor's power to commute a death sentence, most jurors would not be aware that the Governor also may commute a sentence of life imprisonment without possibility of parole and that they should be so informed to avoid any possible misconception conveyed by the description of the sentencing alternative.

[19] In dissent JUSTICE MARSHALL argues that if a balanced instruction cannot or should not be given, "the solution is not to permit a misleading instruction, but to prohibit altogether any instruction concerning commutation." *Post*, at 1017–1018. This observation is incorrect for at least two reasons. First, as discussed below, see n. 27, *infra*, we do not suggest that there would be any federal constitutional infirmity in giving an instruction concerning the Governor's power to commute the death sentence. We note only that such comment is prohibited under state law. Second, the Briggs Instruction simply is not misleading. On the contrary, the instruction gives the jury accurate information in that it corrects a misleading description of a sentencing choice available to the jury. Although, as Justice Richardson noted below, 30 Cal. 3d, at 605, 639 P. 2d, at 938, most jurors may have a general awareness of the availability of commutation and parole, the statutory description of one of the sentencing choices as "life imprisonment *without possibility* of parole" may generate the misleading

## C

Closely related to, yet distinct from, respondent's speculativeness argument, is the contention that the Briggs Instruction is constitutionally infirm because it deflects the jury's focus from its central task. Respondent argues that the commutation instruction diverts the jury from undertaking the kind of individualized sentencing determination that, under *Woodson* v. *North Carolina*, 428 U. S., at 304, is "a constitutionally indispensable part of the process of inflicting the penalty of death."

As we have already noted, *supra*, at 1003, as a functional matter the Briggs Instruction focuses the jury's attention on whether this particular defendant is one whose possible return to society is desirable. In this sense, then, the jury's deliberation is individualized. The instruction invites the jury to predict not so much what some future Governor might do, but more what the defendant himself might do if released into society.

Any contention that injecting this factor into the jury's deliberations constitutes a departure from the kind of individualized focus required in capital sentencing decisions was

---

impression that the Governor could not commute this sentence to one that included the possibility of parole. The Briggs Instruction merely dispels that possible misunderstanding. Further, the defendant may offer evidence or argument regarding the commutation power, and respondent's counsel addressed the possibility of the Governor's commutation of a life sentence in his closing argument. Tr. 1161–1162. The Briggs Instruction thereby accomplishes the same result that would occur if, instead of requiring the Briggs Instruction, the State merely described the sentence statutorily as "life imprisonment with possibility of commutation." Surely, the respondent cannot argue that the Constitution prohibits the State from accurately characterizing its sentencing choices.

We note further that respondent does not, and indeed could not, contend that the California sentencing scheme violates the directive of *Lockett* v. *Ohio*, 438 U. S. 586 (1978). The California statute in question permits the defendant to present any evidence to show that a penalty less than death is appropriate in his case. Cal. Penal Code Ann. § 190.3 (West Supp. 1983).

implicitly rejected by the decision in *Jurek*. Indeed, after noting that consideration of the defendant's future dangerousness was an inquiry common throughout the criminal justice system, the joint opinion of JUSTICES Stewart, POWELL, and STEVENS observed: "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." 428 U. S., at 276. As with the Texas scheme, the California sentencing system ensures that the jury will have before it information regarding the individual characteristics of the defendant and his offense, including the nature and circumstances of the crime and the defendant's character, background, history, mental condition, and physical condition. Cal. Penal Code Ann. § 190.3 (West Supp. 1983).[20]

Respondent also relies on *Beck* v. *Alabama*, 447 U. S. 625 (1980), as support for his contention that the Briggs Instruction undermines the jury's responsibility to make an individualized sentencing determination. In *Beck* the Court held that the jury in a capital case must be permitted to consider a

---

[20] In addition, we note that there is no assurance that a Texas jury acts on a more particularized and less speculative informational base when it considers the defendant's future dangerousness than does a California jury. In *Estelle* v. *Smith*, 451 U. S. 454 (1981), the Court noted that expert psychiatric testimony about the defendant is not necessary to prove the defendant's future dangerousness under the Texas scheme.

"[U]nder the Texas capital sentencing procedure, the inquiry necessary for the jury's resolution of the future dangerousness issue is in no sense confined to the province of psychiatric experts. . . .

.      .      .      .      .

"While in no sense disapproving the use of psychiatric testimony bearing on the issue of future dangerousness, the holding in *Jurek* was guided by recognition that the inquiry mandated by Texas law does not require resort to medical experts." *Id.*, at 472–473.

Consequently, as in the California scheme, a Texas jury's evaluation of the defendant's future dangerousness may rest on lay testimony about the defendant's character and background and the inferences to be drawn therefrom.

verdict of guilt of a noncapital offense where the evidence would support such a verdict. In disapproving the Alabama statute that precluded giving a lesser included offense charge in capital cases, the Court concluded that the chief flaw of the statute "is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.*, at 642. The failure to give a lesser included offense instruction "diverted" the jury in two ways: a jury might convict a defendant of a capital offense because of its belief that he is guilty of *some* crime, or, given the mandatory nature of the death penalty under Alabama law, the jury might acquit because it does not think that the defendant's crime warrants death. *Id.*, at 642–643. According to the respondent, the Briggs Instruction, like the removal of the lesser included offense option in *Beck*, predisposes the jury to act without regard to whether the death penalty is called for on the facts before it.

We are unconvinced that the Briggs Instruction constrains the jury's sentencing choice in the manner condemned in *Beck*. Restricting the jury in *Beck* to the two sentencing alternatives—conviction of a capital offense or acquittal—in essence placed artificial alternatives before the jury. The unavailability of the "third option" thereby created the risk of an unwarranted conviction. By contrast, the Briggs Instruction does not *limit* the jury to two sentencing choices, neither of which may be appropriate. Instead, it places before the jury an additional element to be considered, along with many other factors, in determining which sentence is appropriate under the circumstances of the defendant's case.

More to the point, however, is the fundamental difference between the nature of the guilt/innocence determination at issue in *Beck* and the nature of the life/death choice at the penalty phase. As noted above, the Court in *Beck* identified the chief vice of Alabama's failure to provide a lesser included

offense option as deflecting the jury's attention from "the *central issue* of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.*, at 642 (emphasis added). In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted.[21] Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. In this sense, the jury's choice between life and death must be individualized. "But the Constitution does not require the jury to ignore other possible . . . factors in the process of selecting . . . those defendants who will actually be sentenced to death." *Zant* v. *Stephens*, 462 U. S. 862, 878 (1983) (footnote omitted). As we have noted, the essential effect of the Briggs Instruction is to inject into the sentencing calculus a consideration akin to the aggravating factor of future dangerousness in the Texas scheme. See *supra*, at 1003. This element "is simply one of the countless considerations weighed by the jury in seeking to judge the punishment appropriate to the individual defendant." 462 U. S., at 900 (REHNQUIST, J., concurring in judgment).[22]

---

[21] "[S]entencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does." *Zant* v. *Stephens*, 462 U. S., at 902 (REHNQUIST, J., concurring in judgment).

[22] Consideration of the commutation power does not undermine the jury's statutory responsibility to weigh aggravating factors against mitigating factors and impose death only if the former outweigh the latter. The desirability of the defendant's release into society is simply one matter that enters into the weighing process. Moreover, the fact that the jury is given no specific guidance on how the commutation factor is to figure into

In short, the concern of *Beck* regarding the risk of an unwarranted conviction is simply not directly translatable to the deliberative process in which the capital jury engages in determining the appropriate penalty, where there is no single determinative issue apart from the general concern that the penalty be tailored to the individual defendant and the offense.

Finally, we emphasize that informing the jury of the Governor's power to commute a sentence of life without possibility of parole was merely an accurate statement of a potential sentencing alternative. To describe the sentence as "life imprisonment *without possibility* of parole" is simply inaccurate when, under state law, the Governor possesses authority to commute that sentence to a lesser sentence that includes the possibility of parole. The Briggs Instruction thus corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence.[23] See also n. 18, *supra*.

---

its determination presents no constitutional problem. As we held in *Zant* v. *Stephens, supra*, the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing "scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." *Id.*, at 875.

[23] See also ALI, Model Penal Code § 210.6 (Prop. Off. Draft 1962) (providing that, besides aggravating and mitigating factors, the sentencer "shall take into account . . . any other facts that it deems relevant"). The Model Penal Code further states that the court at the sentencing stage "shall inform the jury of the nature of the sentence of imprisonment that may be imposed, including its implication with respect to possible release upon parole, if the jury verdict is against sentence of death." *Ibid.*

Our approval in *Gregg* v. *Georgia* of the wide-ranging evidence informing the penalty determination in Georgia is equally appropriate here:

"We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a [presentence] hearing and to approve open and far-ranging argument. . . . So long as the evidence introduced and the arguments made at the presen-

## III

Having concluded that a capital sentencing jury's consideration of the Governor's power to commute a life sentence is not prohibited by the Federal Constitution, we now address respondent's contention that the Briggs Instruction must be held unconstitutional because it fails to inform jurors also that a death sentence may be commuted.[24]  In essence, respondent complains that the Briggs Instruction creates the misleading impression that the jury can prevent the defendant's return to society only by imposing the death sentence, thus biasing the jury in favor of death.  Respondent therefore concludes that "[i]f . . . commutation is a factor properly

---

tence hearing do not prejudice a defendant, it is preferable not to impose restrictions.  We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."  428 U. S., at 203–204.

[24] Under Art. V, § 8, of the California Constitution and its implementing statutory sections, Cal. Penal Code Ann. § 4800 *et seq.* (West 1982), the Governor possesses broad authority to reprieve, pardon, or commute sentences, including a death sentence.

Although the state statute containing the Briggs Instruction itself requires instruction only on the Governor's power to commute a sentence of life without possibility of parole, Cal. Penal Code Ann. § 190.3 (West Supp. 1983), the trial judge in this case preceded this specific instruction with the additional statement that the Governor "is empowered to grant a reprieve, pardon, or commutation of *a sentence* following conviction of a crime."  Tr. 1189–1190 (emphasis added).  This statement is ambiguous and might be construed as advising the jury of the Governor's power to commute a death sentence, as well as a life sentence.  However, at oral argument both the State and respondent argued that the ambiguity in the quoted sentence should not be interpreted as advising the jury of the possible commutation of a death sentence.  Tr. of Oral Arg. 10, 18.  More significantly, the State Supreme Court did not interpret the instruction as providing full disclosure of the extent of the Governor's power of commutation.  In fact, it affirmatively concluded that the "jury is *not* informed that a sentence of death may be . . . commuted or modified."  30 Cal. 3d, at 597, 639 P. 2d, at 933 (emphasis in original).  We defer to the State Supreme Court's finding on this point.  See, *e. g., Wolfe* v. *North Carolina,* 364 U. S. 177, 196 (1960); *Lloyd A. Fry Roofing Co.* v. *Wood,* 344 U. S. 157, 160 (1952).

to be considered by the jury, then basic principles of fairness require that full disclosure be made with respect to commutation." Brief for Respondent 35–36.

Thus, according to respondent, if the Federal Constitution permits the jury to consider possible commutation of a life sentence, the Federal Constitution requires that the jury also be instructed that a death sentence may be commuted. We find respondent's argument puzzling.[25] If, as we must assume, respondent's principal objection is that the impact of the Briggs Instruction is to skew the jury toward imposing death, we fail to see how an instruction on the Governor's power to commute death sentences as well as life sentences restores the situation to one of "neutrality." Although such an instruction would be "neutral" in the sense of giving the jury complete and factually accurate information about the commutation power, it would not "balance" the impact of the Briggs Instruction, even assuming, *arguendo*, that the current instruction has any impermissible skewing effect. Disclosure of the complete nature of the commutation power would not eliminate any skewing in favor of death or increase the reliability of the sentencing choice. A jury concerned about preventing the defendant's potential return to society will not be any less inclined to vote for the death penalty upon learning that even a death sentence may not have such an effect. In fact, advising jurors that a death verdict is theoretically modifiable, and thus not "final," may incline them to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers.

In short, an instruction disclosing the Governor's power to commute a death sentence may operate to the defendant's distinct disadvantage. It is precisely this perception that

---

[25] We observe incidentally that respondent at no time requested that the trial judge also charge the jury regarding the Governor's power to commute a death sentence.

the defendant is prejudiced by an instruction on the possible commutation of a death sentence that led the California Supreme Court in *People* v. *Morse,* 60 Cal. 2d 631, 388 P. 2d 33 (1964), to prohibit the giving of such an instruction.[26] Thus, state law at the time of respondent Ramos' trial precluded the giving of the "other half" of the commutation instruction that respondent now argues is constitutionally required.[27]

Moreover, we are not convinced by respondent's argument that the Briggs Instruction alone impermissibly impels the jury toward voting for the death sentence. Any aggravating factor presented by the prosecution has this impact. As we concluded in Part II, *supra,* the State is constitutionally entitled to permit juror consideration of the Governor's power to commute a life sentence. This information is relevant and factually accurate and was properly before the jury. Moreover, the trial judge's instructions "did not place particular emphasis on the role of [this factor] in the jury's ultimate decision."[28] *Zant* v. *Stephens,* 462 U. S., at 889; cf. *id.,* at 888–891.[29]

---

[26] Based on its supervisory powers, the Supreme Court of California held in *Morse* that a capital sentencing jury should not be instructed on either the trial judge's or the Governor's possible reduction of a death penalty. The court concluded that, by suggesting that some other authority would review the propriety of the jury's decision to impose death, the instruction tended to reduce the jury's sense of responsibility in fixing the penalty. 60 Cal. 2d, at 652, 388 P. 2d, at 46.

[27] Given our conclusion in Part II, *supra,* that the State may constitutionally permit consideration of the Governor's power to commute a sentence of life imprisonment without possibility of parole, we do not suggest, of course, that the Federal Constitution prohibits an instruction regarding the Governor's power to commute a death sentence.

[28] The trial judge instructed the jury to "consider all of the evidence and all of the applicable instructions on the law which have been received during any part of the trial of this case" and to consider "any other circumstances which extenuate the gravity of the crime even though it is not a legal excuse for the crime." Tr. 1188–1189.

[29] JUSTICE MARSHALL's dissent claims that the Briggs Instruction encourages the jury to impose the death penalty on the basis of an errone-

## IV

In sum, the Briggs Instruction does not violate any of the substantive limitations this Court's precedents have imposed on the capital sentencing process. It does not preclude individualized sentencing determinations or consideration of mitigating factors, nor does it impermissibly inject an element too speculative for the jury's deliberation. Finally, its failure to inform the jury also of the Governor's power to commute a death sentence does not render it constitutionally infirm. Therefore, we defer to the State's identification of the Governor's power to commute a life sentence as a substantive factor to be presented for the sentencing jury's consideration.

Our conclusion is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their States should not be permitted to consider the Governor's power to commute a sentence.[30] It is elementary that

---

ous assumption that a defendant sentenced to death will not be released. *Post*, at 1016. We emphasize that the instruction is informational and satisfies the *Jurek* requirement that "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." 428 U. S., at 276. In addition, JUSTICE MARSHALL wrongly assumes that the Briggs Instruction will be the determining factor in the jury's choice of the appropriate punishment. As we have emphasized *supra*, at 1008, the Briggs Instruction "does not advise or encourage the jury to reach its verdict in reliance upon this information." 30 Cal. 3d, at 603, 639 P. 2d, at 937 (Richardson, J., dissenting). In addition, as stated above, the trial judge's instructions in this case did not emphasize the role of this factor in the jury's decision.

[30] See, *e. g.*, Ga. Code Ann. § 17–8–76 (1982) (prohibiting argument as to possibility of pardon, parole, or clemency).

Many state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole. The basis of decision in these cases is not always clear—*i. e.*, it often does not appear whether the state court's decision is based on federal constitutional principles. In many instances, however, the state court's decision appears to rest on an interpretation of the State's capital sentencing system and the division of responsibility be-

States are free to provide greater protections in their criminal justice system than the Federal Constitution requires. We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States. We hold only that the Eighth and Fourteenth Amendments do not prohibit such an instruction.

The judgment of the Supreme Court of California is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

tween the sentencer and other authorities effected by that scheme. See, *e. g., People* v. *Walker,* 91 Ill. 2d 502, 515, 440 N. E. 2d 83, 89–90 (1982) ("*Our statute requires* that the court or jury, as the case may be, consider aggravating and mitigating factors, which are relevant to the imposition of the death penalty. . . . Whether or not the defendant may, at some future time, be paroled is not a proper aggravating factor to consider in determining whether the death penalty should be imposed") (emphasis added); *State* v. *Lindsey,* 404 So. 2d 466, 486 (La. 1981) ("Nowhere in the entire sentencing scheme does the [state code of criminal procedure] provide that the sentencing jury may consider the offender's future potential for release should a life sentence be imposed. . . . [G]iving a jury *carte blanche* permission to decide the potential factual consequences of a life sentence allows it to weigh the alternative not in terms of the clear meaning provided for it *by the legislature,* but in terms of a particular number of years versus the death penalty, thereby undermining the jury's responsibility to accept the law as given by the legislature through the court") (emphasis added); *Poole* v. *State,* 295 Md. 167, 197, 453 A. 2d 1218, 1233 (1983) ("[T]his type of argument is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and to then balance one against the other *as required by [the state statute]* . . . . Any consideration of the possibility of parole as such simply is *irrelevant . . .*") (emphasis added); *State* v. *Atkinson,* 253 S. C. 531, 535, 172 S. E. 2d 111, 112 (1970) ("'The Legislature committed to the jury the responsibility to determine in the first instance whether punishment should be life or death. It charged another agency with the responsibility of deciding how a life sentence shall be executed'") (quoting *State* v. *White,* 27 N. J. 158, 177–178, 142 A. 2d 65, 76 (1958)). See also *Sukle* v. *People,* 107 Colo. 269, 273, 111 P. 2d 233, 235 (1941) (consideration of parole outside proper scope of jury's duty as fixed by statute); *State* v. *Jones,* 296 N. C. 495, 502–503, 251 S. E. 2d 425, 429 (1979).

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, and with whom JUSTICE BLACKMUN joins as to Parts II, III, IV, and V, dissenting.

Even if I accepted the prevailing view that the death penalty may constitutionally be imposed under certain circumstances, I could not agree that a State may tip the balance in favor of death by informing the jury that the defendant may eventually be released if he is not executed. In my view, the Briggs Instruction is unconstitutional for three reasons. It is misleading. It invites speculation and guesswork. And it injects into the capital sentencing process a factor that bears no relation to the nature of the offense or the character of the offender.

## I

I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments. See *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting); *Furman* v. *Georgia*, 408 U. S. 238, 358–369 (1972) (MARSHALL, J., concurring). I would vacate the death sentence on this basis alone. However, even if I could accept the prevailing view that the death penalty may constitutionally be imposed under certain circumstances, I would vacate the death sentence in this case.

## II

Apart from the permissibility of ever instructing a jury to consider the possibility of commutation, the Briggs Instruction is unconstitutional because it misleads the jury about the scope of the Governor's clemency power. By upholding that instruction, the majority authorizes "state-sanctioned fraud and deceit in the most serious of all state actions: the taking of a human life." 30 Cal. 3d 553, 597, n. 21, 639 P. 2d 908, 933, n. 21 (1982). See *ibid.* (if the instruction were "part of a contractual negotiation, it would arguably constitute a tortious deceit and a fraudulent misrepresentation").

The Briggs Instruction may well mislead the jury into believing that it can eliminate any possibility of commutation by imposing the death sentence. It indicates that the Governor can commute a life sentence without possibility of parole, but not that the Governor can also commute a death sentence. The instruction thus erroneously suggests to the jury that a death sentence will assure the defendant's permanent removal from society whereas the alternative sentence will not. See *People* v. *Haskett,* 30 Cal. 3d 841, 861, 640 P. 2d 776, 789 (1982).

Presented with this choice, a jury may impose the death sentence to prevent the Governor from exercising his power to commute a life sentence without possibility of parole.[1] See *Gardner* v. *Florida,* 430 U. S. 349, 359 (1977) (opinion of STEVENS, J.) ("we must assume that in some cases [the instruction] will be decisive"). Yet such a sentencing decision would be based on a grotesque mistake, for the Governor also has the power to commute a death sentence. The possibility of this mistake is deliberately injected into the sentencing process by the Briggs Instruction. In my view, the Constitution simply does not permit a State to "stac[k] the deck" against a capital defendant in this manner. *Witherspoon* v. *Illinois,* 391 U. S. 510, 523 (1968). See *Adams* v. *Texas,* 448 U. S. 38, 43–44 (1980).

The majority assumes that the issue is whether a "balanced" instruction would cure the defect. *Ante,* at 1011. It then argues that an instruction about the Governor's power to commute a death sentence would be seriously prejudicial to the defendant and could not in any event have been

---

[1] State courts have recognized that juries will compensate for the possibility of future clemency by imposing harsher sentences. See, *e. g., Farris* v. *State,* 535 S. W. 2d 608, 614 (Tenn. 1976); *Smith* v. *State,* 317 A. 2d 20, 25–26 (Del. 1974); *State* v. *White,* 27 N. J. 158, 177–178, 142 A. 2d 65, 76 (1958).

given since it is forbidden by state law. *Ante,* at 1011–1012.[2] This analysis is based on a fundamental misunderstanding of the issue. The question is not whether a balanced instruction would be more or less advantageous to defendants, but whether the Briggs Instruction is misleading and therefore unconstitutional.

If the Briggs Instruction is indeed misleading, *and the majority never denies that it may lead jurors to impose a death sentence because they wrongly assume that such a sentence will ensure that the defendant will not be released,* it can hardly be defended on the ground that a balanced instruction would be more prejudicial.[3] If, as the majority points out, there are compelling reasons for not informing the jury as to the Governor's power to commute death sentences, the solu-

---

[2] In a footnote the majority notes that the respondent did not request a jury charge regarding the Governor's power to commute a death sentence. *Ante,* at 1011, n. 25. It makes nothing of this fact, however, for reasons that are plain: the California Supreme Court did not find that respondent had waived any objection to the misleading nature of the Briggs Instruction, and, in any event, such an instruction was forbidden by State law.

[3] For some of the reasons articulated by the majority, *ante,* at 1011, the Constitution would presumably forbid instructing a jury in a capital sentencing proceeding to consider the Governor's powers to commute a death sentence. See generally *Farris* v. *State, supra,* at 614 (noting that such an instruction "tends to breed irresponsibility on the part of jurors premised upon the proposition that corrective action can be taken by others at a later date"); *State* v. *Jones,* 296 N. C. 495, 501, 251 S. E. 2d 425, 429 (1979) (jury's sense of responsibility will be reduced by reliance on executive review). The majority suggests that a defendant is free to correct the misleading impression created by the Briggs Instruction by informing jurors about the Governor's power to commute death sentences. *Ante,* at 1004–1005, n. 19. This suggestion is anomalous indeed, since the majority itself has concluded that jurors so informed will be inclined "to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers." *Ante,* at 1011. I cannot agree that a State may force a defendant to choose between being sentenced by a jury which is misinformed and one which is unlikely to view its task with the requisite sense of responsibility.

tion is not to permit a misleading instruction, but to prohibit altogether any instruction concerning commutation. This point seems to have eluded the majority. For some inexplicable reason it concludes that, since a balanced instruction is unavailable, the State is free to mislead the jury about the Governor's clemency power. One searches the majority opinion in vain for some explanation of how the State's inability to give a complete statement of the Governor's commutation powers can possibly justify giving an incomplete statement that is misleading.

I had thought it was common ground that the capital sentencing process must be as reliable, as rational, and as free of mistakes as is humanly possible. Yet the Court upholds the Briggs Instruction without ever disputing its substantial potential to mislead. The Court thus authorizes the State to "cros[s] the line of neutrality" and encourage death sentences by deceiving the jury. *Witherspoon, supra,* at 520.

### III

The Briggs Instruction should be struck down not only because it is misleading, but also because it invites the imposition of the death penalty on the basis of mere speculation. As the majority concedes, *ante,* at 998, n. 8, the Briggs Instruction invites the jury to consider the possibility that if it does not sentence the defendant to death, he may be released through commutation and subsequent parole. The instruction thus invites the jury to speculate about the possibility of release and to decide whether it wishes to foreclose that possibility by imposing a death sentence. Respondent contends that a State may not invite a jury to impose a death sentence on the basis of its ad hoc speculation about the likelihood of a release.

Instead of directly confronting this contention, the majority denies that the principal effect of the Briggs Instruction is to invite the jury to predict the actions of some future Governor and parole board. It instead characterizes the Briggs Instruction as a mere proxy for a determination of future

dangerousness. *Ante,* at 1003, 1005–1006. It then reasons that because the Texas scheme upheld in *Jurek* v. *Texas,* 428 U. S. 262 (1976), requires the jury to determine a defendant's future dangerousness, *Jurek* is "controlling," *ante,* at 1002, and the Briggs Instruction is therefore constitutional.

The Briggs Instruction simply cannot be reduced to the functional equivalent of the scheme upheld in *Jurek.* It neither requires nor even suggests that a jury should make a finding concerning the defendant's future dangerousness, and the jury is provided with no evidence on which to base any such finding.[4] More importantly, whatever else the Briggs Instruction might incidentally lead juries to consider, the one thing it expressly invites them to do is to impose the death penalty on the basis of their ad hoc speculations as to the likelihood of commutation.

Individual jury predictions of the possibility of commutation and parole represent no more than "sheer speculation." *Godfrey* v. *Georgia,* 446 U. S. 420, 429 (1980) (plurality opinion). A jury simply has no basis for assessing the likelihood

---

[4] The Briggs Instruction merely invites the jury to speculate about the likelihood of future release; it says nothing about whether there is a likelihood of future criminal activity in the event of such release. A jury may decide to impose the death penalty to prevent a defendant's release simply because it has concluded that the defendant does not "deserve" to reenter society, and not because of any concern about his dangerousness. *Jurek* says nothing about the permissibility of imposing a death sentence on this basis.

In addition, although a jury presented with the Briggs Instruction might choose to take into account future dangerousness, this in no way makes the instruction the functional equivalent of the Texas scheme. In upholding the Texas scheme this Court stressed that the Texas law assured that "all possible relevant information" is presented to the jury. 428 U. S., at 276. Under the Briggs Instruction not only is the jury not required to make any finding concerning the defendant's future dangerousness, but also there is no requirement that *any* evidence of future dangerousness be introduced. Indeed, with rare exceptions such evidence is inadmissible under California law. See *People* v. *Murtishaw,* 29 Cal. 3d 733, 767–775, 631 P. 2d 446, 468–471 (1981), cert. denied, 455 U. S. 922 (1982).

that a particular defendant will eventually be released if he is not sentenced to death. To invite the jury to indulge in such speculation is to ask it to foretell numerous imponderables: the policies that may be adopted by unnamed future Governors and parole officials, any change in the defendant's character, as well as any other factors that might be deemed relevant to the commutation and parole decisions. Yet these are questions that "no human mind can answer . . . because they rest on future events which are unpredictable." *People* v. *Morse,* 60 Cal. 2d 631, 643, 388 P. 2d 33, 40 (1964). This is inevitable in part because the commutation decision itself is standardless.

The predictive inquiry becomes even more hazardous if, as the majority suggests, the jury also considers whether the defendant would pose a threat to society if and when he is released. A jury, in short, would have to assess not only the likelihood that the defendant will be released, but also the likelihood that his release will be a mistake. I fail to see how any jury can be expected to forecast the future character of a particular defendant and the risk that some state authority, armed with contemporaneous information about his character whose contents the jury can only guess at, will misjudge his character and erroneously release him.

Sentencing decisions based on such groundless predictions are clearly arbitrary and capricious. As the Tennessee Supreme Court put it, a death sentence imposed on this basis is the product of "mere guesswork."[5] If the predictions of particular juries reflect little more than wild speculation, then differences among juries in their predictions are no less the product of caprice and not reason. Yet the Briggs Instruc-

---

[5] *Farris* v. *State,* 535 S. W. 2d, at 613–614, quoting *Graham* v. *State,* 304 S. W. 2d 622, 624 (1957). Accord, *State* v. *Leland,* 190 Ore. 598, 623, 227 P. 2d 785, 796 (1951) ("purely speculative"); *Jones* v. *Commonwealth,* 194 Va. 273, 279, 72 S. E. 2d 693, 697 (1952) (results in punishment based on "speculative elements"); *State* v. *Lindsey,* 404 So. 2d 466, 487 (La. 1981) ("unquantifiable factor").

tion creates the possibility that one defendant may be sentenced to die while another is permitted to live because the first jury perceived a greater likelihood of commutation and parole. This hardly constitutes a meaningful, principled basis for distinguishing a case in which the death penalty is imposed from one in which it is not. *Gregg* v. *Georgia*, 428 U. S., at 188, quoting *Furman* v. *Georgia*, 408 U. S., at 313 (WHITE, J., concurring). See also *Godfrey* v. *Georgia*, *supra*, at 433; *Lockett* v. *Ohio*, 438 U. S. 586, 601 (1978) (plurality opinion).

The imposition of death sentences on the basis of sheer speculation about unknowables can only be arbitrary and capricious. Our prior cases have stressed the heightened need for reliability and rationality in the determination of whether an individual should be sentenced to death. *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion); *Lockett* v. *Ohio*, *supra*, at 604; *Gardner* v. *Florida*, 430 U. S., at 359. The Briggs Instruction injects a level of unreliability, uncertainty, and arbitrariness "that cannot be tolerated in a capital case." *Beck* v. *Alabama*, 447 U. S. 625, 643 (1980).

## IV

Even if the Briggs Instruction did not mislead the jury and call for guesswork, it would be unconstitutional for the independent reason that it introduces an impermissible factor into the capital sentencing process.

The instruction invites juries to impose the death sentence to eliminate the possibility of eventual release through commutation and parole. Yet that possibility bears no relation to the defendant's character or the nature of the crime, or to any generally accepted justification for the death penalty. Since any factor considered by the jury may be decisive in its decision to sentence the defendant to death, *Gardner* v. *Florida*, *supra*, at 359 (opinion of STEVENS, J.), the jury clearly should not be permitted to consider just *any* factor. Rather,

it should only be permitted to consider factors which can provide a principled basis for imposing a death sentence rather than a life sentence. See *Zant* v. *Stephens*, 462 U. S. 862, 885 (1983) (noting that jury may not consider race, religion, or political affiliation, and suggesting that factors which are truly mitigating cannot be the basis for imposing a death sentence).

In my view, the Constitution forbids the jury to consider any factor which bears no relation to the defendant's character or the nature of his crime, or which is unrelated to any penological objective that can justify imposition of the death penalty. Our cases establish that a capital sentencing proceeding should focus on the nature of the criminal act and the character of the offender. "[I]n order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it [must] be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg* v. *Georgia*, *supra*, at 199 (opinion of Stewart, POWELL, and STEVENS, JJ.). The Court has thus stressed that the appropriateness of the death penalty should depend on "relevant facets of the character and record of the individual offender." *Woodson* v. *North Carolina*, *supra*, at 304. Considerations such as the extent of premeditation, the nature of the crime, and any prior criminal activity have been considered relevant to the determination of the appropriate sentence. The requirement that the jury focus on factors such as these is designed to ensure that the punishment will be *"tailored* to [the defendant's] personal responsibility and moral guilt." *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982) (emphasis added).

In sharp contrast, the mere possibility of a commutation "is wholly and utterly foreign to"[6] the defendant's guilt and "not even remotely related to"[7] his blameworthiness. That pos-

---

[6]*Farris* v. *State*, *supra*, at 614.

[7]*State* v. *Lindsey*, *supra*, at 486.

sibility bears absolutely no relation to the nature of the offense or the character of the individual. Whether a defendant's crime warrants the death penalty should not turn on "a speculative possibility that may or may not occur." [8]

The possibility of commutation has no relationship to the state purposes that this Court has said can justify the death penalty. Capital punishment simply cannot be justified as necessary to keep criminals off the streets. Whatever might be said concerning retribution and deterrence as justifications for capital punishment, it cannot be seriously defended as necessary to insulate the public from persons likely to commit crimes in the future. Life imprisonment and, if necessary, solitary confinement would fully accomplish the aim of incapacitation. See *Gregg* v. *Georgia, supra,* at 236, n. 14 (MARSHALL, J., dissenting); *Furman* v. *Georgia, supra,* at 355–359 (MARSHALL, J., concurring). That the death penalty cannot be justified by considerations of incapacitation was implicitly acknowledged in *Gregg,* where the joint opinion of JUSTICES Stewart, POWELL, and STEVENS relied entirely on retribution and deterrence as possible justifications for the death penalty, 428 U. S., at 183, and mentioned incapacitation only in passing as "[a]nother purpose that has been discussed." *Id.,* at 183, n. 28. [9]

This conclusion is in no way altered by California's decision to establish an alternative sentence to death that does not

---

[8] *People* v. *Walker,* 91 Ill. 2d 502, 515, 440 N. E. 2d 83, 89 (1982).

[9] *Jurek* v. *Texas,* 428 U. S. 262 (1976), does not establish that the goal of incapacitation may justify the death penalty. This question was not addressed in *Jurek.* The petitioner in *Jurek* did not attack the Texas capital sentencing scheme on this ground, but rather contended that the scheme would not prevent the arbitrary and capricious infliction of the death penalty. The Court rejected this attack on the *procedures* prescribed by the Texas scheme, *id.,* at 268–276 (opinion of Stewart, POWELL, and STEVENS, JJ.); *id.,* at 278–279 (WHITE, J., joined by BURGER, C. J., and REHNQUIST, J., concurring in judgment), but did not decide the *substantive* question of whether a prediction of future dangerousness is a proper criterion for determining whether a defendant is to live or die.

guarantee permanent confinement. If a death sentence is inappropriate, a State cannot justify its imposition on the ground that the alternative it has provided, which in this case leaves open the possibility of future release, may be considered inadequate by the jury. An analogy may be usefully drawn to this Court's decision in *Beck* v. *Alabama,* 447 U. S. 625 (1980). In *Beck* we struck down an instruction which created a risk that a defendant would be convicted of a crime of which he was not guilty. We necessarily rejected any suggestion that such an instruction could be justified by the fact that the alternative it presented was no conviction at all. Presenting the jury in a capital case with the choice between an unwarranted conviction and an acquittal is impermissible because it may induce the jury to convict simply to ensure that the defendant receives some punishment. Such a choice "would seem inevitably to enhance the risk of an unwarranted conviction." *Id.,* at 637. Similarly, a defendant may not be sentenced to death simply because the alternative the State has adopted does not ensure incapacitation. The State may not use the unavailability of permanent imprisonment to induce juries to sentence to death defendants whose appropriate punishment is something less severe. "That death should be inflicted when a life sentence is appropriate is an abhorrent thought." *State* v. *White,* 27 N. J. 158, 178, 142 A. 2d 65, 76 (1958).

Finally, the Briggs Instruction impermissibly invites jurors to impose death sentences on the basis of their desire to foreclose a duly authorized review of their judgment of conviction. Although the power to grant clemency is not restricted by standards, it is reasonable to assume that it will at least be exercised when the Governor concludes that "the criminal justice system has unjustly convicted a defendant." *Roberts* v. *Louisiana,* 428 U. S. 325, 350 (1976) (WHITE, J., joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., dissenting). Yet the very jury whose judgment of conviction would be the subject of any future application for

clemency is led to believe that it may impose the death sentence to preclude such an application.[10]  I am aware of no authority, and the majority cites none, for the proposition that a judicial body may base any decision, no less one concerning the life or death of an individual, on a desire to immunize its own actions from duly authorized reexamination.[11]

## V

The conclusion that juries should not be permitted to consider commutation and parole in deciding the appropriate sentence is shared by nearly every jurisdiction which has considered the question.  In prior decisions this Court has consistently sought "guidance . . . from the objective evidence of the country's present judgment" in determining the constitutionality of particular capital sentencing schemes. *Coker* v. *Georgia*, 433 U. S. 584, 593 (1977).  See, *e. g.*, *Solem* v. *Helm*, *ante*, at 290–292; *Enmund*, 458 U. S., at 812–816 (O'CONNOR, J., dissenting); *Beck* v. *Alabama*, *supra*, at 637; *Gregg* v. *Georgia*, 428 U. S., at 179–182; *Woodson* v. *North Carolina*, 428 U. S., at 294–299.  With

---

[10] It matters not that the jury in California cannot actually eliminate the possibility of commutation because a death sentence may be commuted as well.  The Briggs Instruction omits any mention of this fact, and, as the majority acknowledges, *ante*, at 1011–1012, there exist compelling reasons why a defendant would not wish to and should not be forced to bring it to the jury's attention.  See n. 3, *supra*.

[11] State courts have consistently held that juries may not be permitted to circumvent the actions of other branches of government through the preemptive imposition of the death penalty.  See, *e. g.*, *Murray* v. *State*, 359 So. 2d 1178 (Ala. Crim. App. 1978) (consideration of commutation subverts jury's properly assigned role); *Andrews* v. *State*, 251 Ark. 279, 290, 472 S. W. 2d 86, 92 (1971) (consideration of commutation takes jury "far afield from its proper purpose and prerogative"); *Broyles* v. *Commonwealth*, 267 S. W. 2d 73, 76 (Ky. 1954) (when jury anticipates acts of executive branch it "circumvent[s] . . . and infringes upon [their] prerogatives"); *State* v. *Lindsey*, 404 So. 2d, at 486–487 (jury would improperly pre-empt the Governor's duly authorized power); *Jones* v. *Commonwealth*, 194 Va. 273, 279, 72 S. E. 2d 693, 697 (1952).

scarcely a word of explanation, today's decision dismisses the overwhelming weight of authority establishing that a jury may not be informed of the possibility that a defendant may be released if he is not sentenced to death.

The propriety of allowing a sentencing jury to consider the power of a Governor to commute a sentence or of a parole board to grant parole has been considered in 28 jurisdictions in addition to California.[12] Of those jurisdictions, 25 have concluded, as did the California Supreme Court in this case, that the jury should not consider the possibility of pardon, parole, or commutation.[13] In only three jurisdictions has it

---

[12] California is the only State which has a statute requiring that the jury be instructed to consider the possibility of commutation. In other jurisdictions, the issue has generally arisen either because the jury inquired about parole or commutation or because the defendant contended that the prosecution improperly argued the issue to the jury.

[13] Most of these decisions concern jury sentencing in capital cases, although some concern noncapital cases. While some decisions have found the error harmless, in none of these cases did a court find a jury instruction concerning parole or commutation to be harmless. See, e. g., Grady v. State, 391 So. 2d 1095 (Ala. Crim. App. 1980) (noncapital); Westbrook v. State, 265 Ark. 736, 580 S. W. 2d 702 (1979); Jones v. State, 146 Colo. 40, 360 P. 2d 686 (1961); Smith v. State, 317 A. 2d 20 (Del. 1974); Paramore v. State, 229 So. 2d 855 (Fla. 1969) (prosecutor argument improper but not reversible error), vacated on other grounds, 408 U. S. 935 (1972); Gilreath v. State, 247 Ga. 814, 279 S. E. 2d 650 (1981), cert. denied, 456 U. S. 984 (1982); People v. Szabo, 94 Ill. 2d 327, 447 N. E. 2d 193 (1983); Farmer v. Commonwealth, 450 S. W. 2d 494 (Ky. 1970); State v. Brown, 414 So. 2d 689 (La. 1982); Poole v. State, 295 Md. 167, 453 A. 2d 1218 (1983); State v. Thomas, 625 S. W. 2d 115 (Mo. 1981); Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632 (1955) (prosecutorial argument improper but not reversible error), cert. denied, 352 U. S. 880 (1956); Summers v. State, 86 Nev. 210, 213, 467 P. 2d 98, 100 (1970) (reaffirming Serrano v. State, 86 Nev. 676, 447 P. 2d 497 (1968), which instructed jury to assume that life without parole means exactly that); State v. Conklin, 54 N. J. 540, 258 A. 2d 1 (1969); State v. Jones, 296 N. C. 495, 251 S. E. 2d 425 (1979); McKee v. State, 576 P. 2d 302 (Okla. Crim. App. 1978) (noncapital); State v. Leland, 190 Ore. 598, 227 P. 2d 785 (1951), aff'd, 343 U. S. 790 (1952); Commonwealth v. Aljoe, 420 Pa. 198, 216 A. 2d 50 (1966); State v. Goolsby, 275 S. C. 110, 268 S. E. 2d 31, cert. denied, 449 U. S. 1037 (1980); Farris v.

been deemed proper to allow a jury to consider the possibility that a sentence can be reduced by commutation or parole, and two of those cases [14] were decided before *Furman* v. *Georgia*, 408 U. S. 238 (1972). Only one post-*Furman* decision has approved of jury consideration of parole or commutation,[15] and that decision concerned a capital sentencing scheme in which the jury merely recommends the sentence. Moreover, not only has the view embraced by the majority been almost uniformly rejected, but in those States which formerly permitted jury consideration of parole and commutation the trend has been to renounce the prior decisions.[16]

I would have thought that this impressive consensus would "weigh heavily in the balance" in determining the constitutionality of the Briggs Instruction. *Enmund* v. *Florida, supra,* at 797. The majority breezily dismisses that consensus with the terse statement that "States are free to provide

---

*State,* 535 S. W. 2d 608 (Tenn. 1976) (noncapital); *Clanton* v. *State,* 528 S. W. 2d 250 (Tex. Crim. App. 1975); *Clanton* v. *Commonwealth,* 223 Va. 41, 286 S. E. 2d 172 (1982); *State* v. *Todd,* 78 Wash. 2d 362, 474 P. 2d 542 (1970); *State* v. *Lindsey,* 160 W. Va. 284, 233 S. E. 2d 734 (1977) (noncapital); *State* v. *Carroll,* 52 Wyo. 29, 69 P. 2d 542 (1937). Contrary to the majority's suggestion, *ante,* at 1013–1014, n. 30, these decisions rest on much broader grounds than the interpretation of particular state statutes.

[14] *Massa* v. *State,* 37 Ohio App. 532, 538–539, 175 N. E. 219, 221–222 (1930); *State* v. *Jackson,* 100 Ariz. 91, 412 P. 2d 36 (1966).

[15] *Brewer* v. *State,* 275 Ind. 338, 417 N. E. 2d 889 (1981).

[16] In 1955, for instance, the Georgia Legislature overruled prior decisions to the contrary by enacting a statute forbidding any jury argument concerning commutation or parole. Ga. Code Ann. § 27–2206 (1972). See *Strickland* v. *State,* 209 Ga. 65, 70 S. E. 2d 710 (1952) (cases discussed therein). In 1958 the New Jersey Supreme Court reversed a line of decisions which had approved of jury consideration of commutation and parole. *State* v. *White,* 27 N. J. 158, 142 A. 2d 65 (1958). And in 1976 the Tennessee Supreme Court invalidated a statute that required juries to be instructed about parole in felony cases. *Farris* v. *State, supra.* See also *Andrews* v. *State,* 251 Ark. 279, 472 S. W. 2d 86 (1971) (disapproving earlier decisions permitting judge, when asked by jurors, to inform them of possibility of reduction of sentence).

greater protections . . . than the Federal Constitution requires." *Ante*, at 1014. This observation hardly suffices as an explanation, however, since the same thing could have been said in *Enmund, Coker, Beck,* and *Woodson,* yet in each of those decisions the Court looked to prevailing standards for guidance.

The majority's approach is inconsistent with the compelling reasons for according "due regard," *Coker* v. *Georgia*, 433 U. S., at 592, to the contemporary judgments of other jurisdictions. This Court has stressed that the "[Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion), and that "[c]entral to the application of the Amendment is a determination of contemporary standards regarding the infliction of punishment." *Woodson* v. *North Carolina*, 428 U. S., at 288 (opinion of Stewart, POWELL, and STEVENS, JJ.). Moreover, unless this Court's judgment is "informed by objective factors to the maximum possible extent," its decisions may reflect "merely the subjective views of individual Justices." *Coker, supra,* at 592 (plurality opinion).

## VI

Whatever interest a State may have in imposing the death penalty, there is no justification for a misleading instruction obviously calculated to increase the likelihood of a death sentence by inviting the jury to speculate about the possibility that the defendant will eventually be released if he is not executed. I would vacate respondent's death sentence.

JUSTICE BLACKMUN, dissenting.

I join Parts II through V of JUSTICE MARSHALL's opinion in dissent.

I had understood the issue in this case to be whether a State constitutionally may instruct a jury about the Governor's power to commute a sentence of life without parole. That issue involves jury consideration of the probability of

action by the incumbent Governor or by future Governors. Instead, the Court, on its own, redefines the issue in terms of the dangerousness of the respondent, an issue that involves jury consideration of the probability that respondent will commit acts of violence in the future. *Ante,* at 1002-1003. As both JUSTICE MARSHALL, *ante,* at 1018-1019, and JUSTICE STEVENS, *post,* at 1030, so forcefully point out, the two questions do not relate to each other. Neither the State of California nor the solitary dissenter in the State's Supreme Court ventured such an argument.

The issue actually presented is an important one, and there may be arguments supportive of the instruction. The Court, however, chooses to present none. Instead, it approves the Briggs Instruction by substituting an intellectual sleight of hand for legal analysis. This kind of appellate review compounds the original unfairness of the instruction itself, and thereby does the rule of law disservice. I dissent.

JUSTICE STEVENS, dissenting.

No rule of law required the Court to hear this case. We granted certiorari only because at least four Members of the Court determined—as a matter of discretion—that review of the constitutionality of the so-called Briggs Instruction would represent a wise use of the Court's scarce resources.

When certiorari was granted in this case, the Court had been informed by the respondent that the Briggs Instruction is unique: "Only California requires that juries be instructed selectively on the Governor's power to commute life without parole sentences." Further, the Court had been informed, accurately, that the overwhelming number of jurisdictions condemn any comment whatsoever in a capital case on the Governor's power to commute. That statement was followed by a half-page list of citations to state-court decisions. Brief in Opposition 6–7. See *ante,* at 1026–1027 (JUSTICE MARSHALL, dissenting). These facts shed an illuminating light on the Court's perception of how its discretion should be exercised.

Even if one were to agree with the Court's conclusion that the instruction does not violate the defendant's procedural rights, it would nevertheless be fair to ask what harm would have been done to the administration of justice by state courts if the California court had been left undisturbed in its determination. It is clear that omission of the instruction could not conceivably prejudice the prosecutor's legitimate interests. Surely if the character of an offense and the character of the offender are such that death is the proper penalty, the omission of a comment on the Governor's power to commute a life sentence would not preclude the jury from returning the proper verdict. If it were true that this instruction may make the difference between life and death in a case in which the scales are otherwise evenly balanced, that is a reason why the instruction should not be given—not a reason for giving it. For the existence of the rarely exercised power of commutation has absolutely nothing to do with the defendant's culpability or his capacity for rehabilitation. The Governor's power to commute is entirely different from any relevant aggravating circumstance that may legitimately impel the jury toward voting for the death penalty. See *ante*, at 1012. The Briggs Instruction has no greater justification than an instruction to the jury that if the scales are evenly balanced, you should remember that more murders have been committed by people whose names begin with the initial "S" than with any other letter.

No matter how trivial the impact of the instruction may be, it is fundamentally wrong for the presiding judge at the trial—who should personify the evenhanded administration of justice—to tell the jury, indirectly to be sure, that doubt concerning the proper penalty should be resolved in favor of the most certain method of preventing the defendant from ever walking the streets again.

The Court concludes its opinion by solemnly noting that we "sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is

best left to the States." *Ante*, at 1014. Why, I ask with all due respect, did not the Justices who voted to grant certiorari in this case allow the wisdom of state judges to prevail in California, especially when they have taken a position consistent with those of state judges in Alabama, Arkansas, Colorado, Delaware, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Missouri, Nebraska, Nevada, New Jersey, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, and Wyoming?

I repeat, no rule of law commanded the Court to grant certiorari. No other State would have been required to follow the California precedent if it had been permitted to stand. Nothing more than an interest in facilitating the imposition of the death penalty in California justified this Court's exercise of its discretion to review the judgment of the California Supreme Court. That interest, in my opinion, is not sufficient to warrant this Court's review of the validity of a jury instruction when the wisdom of giving that instruction is plainly a matter that is best left to the States.

For the reasons stated in Parts II to V of JUSTICE MARSHALL's opinion, I disagree with the Court's decision on the merits. But even if the Court were correct on the merits, I would still firmly disagree with its decision to grant certiorari. I therefore respectfully dissent.